## Case No. 5,760.

### GREEN v. SARMIENTO.

[Pet. C. C. 74;[1] 3 Wash. C. C. 17.]

Circuit Court, D. Pennsylvania. Oct. Term, 1810.

CONTRACTS—LAW OF PLACE—DISCHARGE UNDER BANKRUPT LAWS—CONCLUSIVENESS OF A JUDGMENT.

1. The law of the country, where the contract is made, is the law of the contract wherever performance is demanded; and the same law which creates the charge, will be regarded, if it operate a discharge of the contract.

[Cited in Taylor v. Carpenter, Case No. 13,-785; Phillips v. Preston, 5 How. (46 U. S.) 291.]

2. A debt contracted in one country, cannot be discharged by the bankrupt laws of another country.

[Cited in Le Roy v. Crowninshield, Case No. 8,269; Towne v. Smith, Id. 14,115; Re Shepard, Id. 12,753.]

3. A judgment in a state court, is conclusive in every other state, and extinguishes the original ground of action.

[Approved in Field v. Gibbs, Case No. 4,766. Cited in Campbell v. Claudius, Id. 2,356; Sarchet v. The General Isaac Davis, Id. 12,357; Whitaker v. Bronson, Id. 17,526; U. S. v. Reese, 92 U. S. 251.]

[Cited in Hazzard v. Nottingham, Tapp. 146; Cole v. Driskell, 1 Blackf. 18; Wyman v. Campbell, 6 Port. (Ala.) 619; Kittredge v. Emerson, 15 N. H. 262; Wood v. Watkinson, 17 Conn. 502; Sessions v. Stevens, 1 Fla. 233; McDade v. Burch, 7 Ga. 559; Warren v. Lusk, 16 Mo. 112; Baltzell v. Nosler, 1 Iowa, 588; McGilvray v. Avery, 30 Vt. 539; Dunham v. Downer, 31 vt. 262; Bank of North America v. Wheeler, 28 Conn. 439; Barnes v. Gibbs, 31 N. J. Law, 320; Lowry v. Inman, 46 N. Y. 123; Glass v. Blackwell, 48 Ark. 50, 2 S. W. 258.]

This was an action of debt, brought on a judgment recovered in the mayor's court of New York, in an action of assumpsit against the defendant and Mahony, as partners, on a contract stated to have been made at Madeira. Plea nil debet, and bankruptcy of defendant in 1801, and a certificate of discharge at Teneriffe. By the New York record, it appears, that the capias ad respondendum, was executed upon the defendant, but not on Mahony. The defendant entered an appearance by counsel, and, in 1795, pleaded non assumpsit. In 1796 he was called, and not appearing, a jury was impanelled to try the issue, who found a verdict for the sum now demanded, and in 1797 judgment was entered for the plaintiff. The bankruptcy of the defendant, and the proceedings against him, according to the law and usage of Spain, in the island of Teneriffe in 1801, and his certificate and discharge, were fully proved.

For the plaintiff it was argued: First, that it is not to be presumed, that the original contract was made at Teneriffe, or in a country subject to Spain; and that to make the proceedings on that ground, operate as a discharge, it was necessary for the defendant to prove this fact. Doug. 1; 1 East, 6. Sec-

ond, that though it were made at Teneriffe, still the judgment merges the original contract, and affords a new consideration for the assumpsit, even though the judgment should be considered as only prima facie evidence. 6 Rep. [Coke] 44b. Third, but most certainly so, if the judgment be conclusive, and that the constitution and act of congress make it conclusive. Armstrong v. Carson [Case No. 543]. All these points were controverted by the defendant, and the cases below were cited: 2 Kame, Eq. 367, 365, 374; Camp. 63; 1 Caines, 460; 1 Johns. 424; 1 Mass. 401; [James v. Allen] 1 Dall. [1 U. S.] 191; [Phelps v. Holker] Id. 261; 5 East. 124; Coop. Bankr. Law, Append. 27, 30; [Millar v. Hall] 1 Dall. [1 U. S.] 229; 6 Johns. 287; 5 Johns. 132; 9 East, 192; 5 Johns. 37; Coop. Bankr. Law, 361–373; 8 Term R. 609.

WASHINGTON, Circuit Justice (charging jury). I shall consider the validity of the plea of bankruptcy, and discharge at Teneriffe, first, in relation to the original debt, independent of the judgment on which this action is founded; and secondly, as it may affect that judgment.

First, the rule is, that the law of the country where a contract is made, is the law of the contract, wherever performance is demanded; and the same law which creates the charge, will be regarded, if it operate a discharge of the contract. The laws of one country, can have in themselves no extraterritorial force, except so far as the comity of other nations may extend to give them effect; and where is the nation that will, or ought to acknowledge the validity of foreign laws, legislating over persons not within the jurisdiction of such foreign country, and affecting contracts entered into elsewhere, and with a view to other laws? It is said, that France acknowledges the binding force of foreign bankrupt laws, to discharge the foreign debtor, from all his contracts, wherever made. If this be so, I can only say, that the comity of that nation, is marked by a whimsical, and I think an irrational opposition, to that which obtains in most other countries. She disregards the decisions of foreign prize courts, so far as they affect the subjects of France; although they are courts of the law of nations, and although all the world are nominally parties to the causes they decide, and the captor and captured, are, in reality, the immediate parties; and yet she submits to foreign municipal laws, affecting the interests of French subjects, upon the ground of a mere fiction, which in reality favours, only the subjects of the country, where the law operates to the unjust exclusion of her own subjects. It is said, that the rule observed in the state of Pennsylvania, is different from that which is approved by the court as the general rule; and to prove this, the case of Millar v. Hall, 1 Dall. [1 U. S.] 229, has been cited and relied upon. In the case of Banks v. Greenleaf [Case No. 959], decided

ten or twelve years ago in the circuit court of Virginia, upon the ground that a contract made in Virginia, was not discharged by the insolvent law of Maryland, Millar v. Hall was cited. It was then, and continues to be my opinion, that that case is consistent with the rule before laid down; the debt having accrued at Baltimore, where the goods were sold, and the money received. If then the general rule be correctly stated, it is essential to the support of the defendant's defence, set up in this cause, in relation to the original contract, to prove, that it was made at Teneriffe, or in some place governed by Spanish laws. No direct proof of this fact has been given, and certainly the circumstance of the defendant, having generally resided at Teneriffe, from the year 1790 to the year 1810, furnishes a very slender ground for presuming it. Occasional absences have been admitted, at which times the contract in question, might have been made at Madeira; or it may have accrued there, although the defendant had never left the island of Teneriffe; since it does not appear where Mahony, the other partner, lived; and since the debt might have been contracted, in a variety of ways at Madeira, though both partners had always resided at Teneriffe. If then this debt was not contracted at Teneriffe, the cause is against the defendant, independent of any change produced by the judgment; but as it is possible the jury may not view the evidence in the light it is seen by the court, it may be necessary to consider the second point; which is, did the judgment so far alter the nature of the original contract, that it could not be discharged by the proceedings at Teneriffe, on the bankruptcy of Sarmiento?

It is contended by the counsel for the plaintiff, that the original contract is so completely extinguished by the judgment, that it cannot be noticed in reference to any question, to which it might previously have given rise; and therefore, that the debt must be considered as having accrued under the judgment, in the state of New York. This is certainly true, where the judgment is conclusive and not subject to examination in a court of coordinate jurisdiction; nor does the court mean to intimate that the rule would not be the same, in a case where the judgment is only prima facie evidence of a debt. But, since this latter point has not been considered, and the court is prepared to give an opinion upon the great question, which has been discussed, of the conclusiveness of a judgment of a state court, in every other state of the Union; it is thought best to decide it now, that the point may be put at rest in this court, as well as elsewhere, in case it should be deemed proper to take the opinion of the supreme court upon it. We never expect to hear the question more ably argued.

The first section of the fourth article of the constitution of the United States, declares, "that full faith and credit shall be given in each state, to the public acts, records and judicial proceedings of every other state. And that congress may, by general laws, prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof." This section has three distinct objects: First, to declare, that full faith and credit shall be given in each state, to the records, &c. of every other state; secondly, the manner of authenticating such records, &c.; and thirdly, their effect when so authenticated. The first is declared and established by the constitution itself, and was to receive no aid, nor was it susceptible of any qualification, by the legislature of the United States. The second and third objects of the section, were expressly referred to the legislature of the Union, to carry them into effect in such manner, as to that body might seem right; and it will presently be seen how very correct this reference was. That the intention of the constitution, to invest congress with the power to declare the judgments of the courts of one state, conclusive in every other, and even to clothe them with a still more extended force and effect, corresponded with the strong and unambiguous expressions used in this article, will appear from the following considerations. First, it is presumable, that the enlightened framers of that instrument knew, that by the general comity of nations, and by the long established rules of that country, whose decisions were once of binding authority in the United States, and to a certain period, were still observed and adopted; a foreign judgment might be made the foundation of an action here, and was prima facie evidence of its own correctness. It is highly probable, therefore, that the constitution intended something more, than merely to recognize an established rule of law, which without such a declaration, would allow in each state, at least as much faith and credit to the judgments of a sister state, as to those of a country foreign to the United States. If nothing more was meant, the provision was certainly unnecessary. It would on the contrary seem more natural that the constitution, which was intended to "form a more perfect union," and a more close and intimate connexion of the states, than had existed under the confederation; would consider the judgments of the several states, in relation to each other, as domestic rather than foreign judgments.

Secondly, the change of the language of this section of the constitution, from the parallel section of the articles of confederation, affords a strong reason for the opinion, that the former was intended to give to the judgments of each state within the other states, a more extensive force and effect, than the rule of law, founded on mere comity, had allowed to foreign judgments. The fourth article of the confederation, goes no farther than to declare, that "full faith and credit shall be given in each state, to the records, acts, and judicial proceedings of the courts

and magistrates of every other state;" whereas the constitution proceeds to add, that congress may declare what shall be the effect of such records, acts, and judicial proceedings. And what reasonable objection, let me ask, can be offered against extending to the judgments of each state, in every other state, the rule which is applicable to domestic judgments within the same state? Does it consist with the peace of society, with the interest or security of individuals, that a question which has once been fairly tried and decided, should be litigated again and again, before other tribunals of co-ordinate jurisdiction, as often as one of the parties may chuse to withdraw himself from the jurisdiction of the state, where the decision has been made? Is it right to open again the door of litigation, which has once been regularly closed, and to re-examine the original cause of action, when possibly by the death or absence of witnesses, or the loss of other testimony, the justice of the case can no longer be reached? But, it is objected, that the judgment may be unjust, upon the merits of the case, or erroneous in point of law; and ought such a decision, it is asked, to be submitted to, by the courts of another state? I answer, that the contrary of all this ought to be presumed; and let me ask in return, which is the state that stands so pre-eminent for virtue and knowledge, as to say with confidence, that the judgments of her courts would be more just, or more consonant to law, than those of her sister states? I admit that the supposed case, upon which the objection is founded, may sometimes happen; but I am far from conceding, that in all cases the evil would be remedied, by a re-examination of the cause, before another tribunal, in another state; and the general good forbids that this should be done.

I now proceed to enquire, in what manner congress have exercised the power confided, by the above section of the constitution, to that body. As a key to the intention of the legislature, the title to the law, which is now to be examined, deserves peculiar regard. The will of the people, expressed in the section of the constitution, before mentioned, remained unfulfilled, until congress should have made provision, respecting the two objects which that section had referred to them; and the title declares in explicit terms, the determination of that body to act upon both. The words are "an act to prescribe the mode in which the public acts, records and judicial proceedings, in each state, shall be authenticated, so as to take effect in every other state." The law then proceeds to make provision for the first of these avowed objects, by prescribing the mode of authentication, and then declares, "that the said records and judicial proceedings so authenticated, shall have such faith and credit given to them in every court, within the United States, as they have by law or usage in the courts of the state from whence they shall be taken." It

has been contended, that this latter sentence, (for there are but two in the enacting part of the law) means no more than that full faith and credit shall be given to the record, so authenticated; as evidence, that such proceedings were had, and such judgment rendered, as the record imports. But the sentence does not go so far as this; for it does not give full faith and credit, but such faith and credit, as the record has in the state from whence it is taken. Now, congress had no authority to declare, that full faith and credit should be given to such public acts and records, as a matter of evidence; because the supreme law of the land, had already pronounced upon that subject; and a similar declaration, by this subordinate body, would have been idle, if not mischievous. If this sentence meant to qualify and restrain the credit, to which such evidence is entitled under the constitution, by referring it to the rule of the state laws and usages; then such intention would be a palpable violation of the constitution, which gives to such evidence, full faith and credit. It is impossible, therefore, to rescue the legislature from the charge of folly or usurpation, but by confining the last sentence of the law, to one of the two objects, referred to that body by the constitution; and since the mode of authenticating public acts and records, had been provided for, by the first sentence, the conclusion is inevitable, that this sentence was intended, and could only have been intended, to declare the force and effect to be given to records and judicial proceedings, when so authenticated. Under this view of the subject, the power to limit the effect of such judicial proceedings, is undoubted; and it was wisely left to the discretion of congress, to regulate the degree of force to be given to such proceedings. For, if the constitution or the law, had declared generally, that the judgments in one state, should be conclusive in every other; very embarrassing questions would have arisen, as to the degree to which they were conclusive. If not conclusive in the state where the judgment was rendered, it might have been attended with mischievous consequences, to declare them so in other states. In some of the states, perhaps, judgment upon an attachment, may be conclusive only as to the thing attached; in others, it may be so as to the matter decided, and to operate against the person and estate of the defendant generally. In others again, the judgment may be so far inconclusive, that it may be opened and examined upon the performance of certain conditions, within a limited period. The present case, affords a strong illustration. The judgment is against Sarmiento and Mahony, although process was not served on the latter, nor did he appear or take defence. Is the judgment by the law of New York, conclusive as to Mahony? Possibly it may be so, upon the ground, that it was a partnership transaction; and that as one partner may bind, so he may defend his as-

sociate. But a different course of reasoning might prevail in other states, and the law might consider it only prima facie evidence, or no evidence at all, against the defendant, who was not served with the process. These, and a variety of other cases, which might be put, show the wisdom of the legislature in giving to such judgments, only such credit, as they possess in the state where they were rendered.

Now let me ask this question of those who deny the conclusiveness of the judgment. If a court in Pennsylvania, should declare, that a judgment of a court of New York, is evidence only that such a judgment was rendered, and that the same is only prima facie evidence that a debt is due or not due; does that court give as much faith and credit to such judgment, as is given to it, by the laws and usages of the state of New York; which pronounce it to be evidence, and conclusive evidence, not only of the existence of the judgment, but of the right which it has decided? If then you deny to such judgment, the force and effect given to it, by the laws of New York; you deprive it of the same faith and credit, which the same laws attribute to it; and in truth, the latter expressions, as used in the act of congress, are synonymous with the former. Nothing remains, but to answer some of the objections made to this construction. It is said, that the judgment which thus claims an exemption from re-examinations, may have been exparte; the defendant having had no opportunity to make his defence. If the law of the state does not prohibit such an outrage upon the immutable dictates of justice; then the court which inadvertently gave the judgment, or a superior court, would provide the redress. If the law or the courts, should leave the injured party without a remedy, I will not say, (because in this case it is unnecessary,) whether the courts of another state would be bound to consider such a judgment, as conclusive or not. But, if they should be so found, then I can only say, that the act of congress was not passed with sufficient consideration; and that it may, and ought to be so amended, as to give a conclusive effect to judgments, only in cases where the trial was perfectly fair, and where both parties were, or might have been heard. But the supposed case, although it might form an exception, furnishes no just ground of objection to the rule itself.

As to the second objection, it is said the judgment on which this action is founded was exparte, erroneous and unjust. The answer to this is, that there is no foundation for the complaint, that the judgment was exparte; because the defendant was served with process, and pleaded to the action. If the judgment be not erroneous, it would doubtless have been reversed, if the defendant had thought proper to carry it before an appellate court. If the plaintiff's claim was unfounded, for which, by the bye,

we have only the defendant's assertion; he has no one but himself to blame for not having proved it so, at the trial of the cause.

Third objection. If the judgment is to have such effect in this state, as it has in the state of New York, it would create a lien on lands lying in this state; an execution might issue from the mayor's court, where the judgment was rendered into this state, or a scire facias might lie. These, if they be evils, are altogether imaginary. The judgment of itself, has no extra-territorial force; the laws of New York can give it none, nor does it obtain it from the act of congress. The courts of the other states, are enjoined to give such faith and credit to it, as it is entitled to in the state of New York. If it be conclusive evidence of the right it establishes, in the courts of New York, it is conclusive here; and this is all that the act of congress requires. There however is no doubt in my mind, but that congress may give to the judgments of one state, all the effect which it is complained may follow from the rule laid down by the court; and I confess that I can see no good reason, why such an effect may not in part be given. Why ought not an execution to issue, upon a judgment rendered in one state, against the person and effects of the defendant, found in any other? It is unnecessary, however, to moot the policy of the measure, which must rest with congress in its wisdom to adopt, if it should seem right to that body to do so.

Upon the whole, it is the opinion of the court, that this judgment is conclusive, and amounts to a complete extinguishment of the original contract, wherever it might have been made; and consequently, upon the rule first laid down, the bankruptcy, certificate and discharge of the defendant at Teneriffe, afford no bar to the plaintiff's present demand, and your verdict ought to be for the plaintiff.

Verdict for plaintiff.