## IV.  Conclusion

In *United States v. Morrison*, decided this term, the Supreme Court warned against overly elastic conceptions of the Commerce Clause that would give Congress authority over "family law and other areas of traditional state regulation since the aggregate effect of marriage, divorce, and childrearing on the national economy is undoubtedly significant." *Morrison*, 120 S. Ct. at 1744.  Mindful of this admonition, we hold today that the provisions of the Child Support Recovery Act of 1992 contained in 18 U.S.C. §228 (1994) exceed Congress's authority under the Constitution. In so doing, we observe that this ruling does not prevent Congress from assisting the States in obtaining interstate enforcement of their courts' orders.  Congress can do so (and has done so) pursuant to the Full Faith and Credit Clause. *See* Full Faith and Credit for Child Support Orders Act, Pub. L. No. 103-383, 108 Stat. 4064 (1994) (codified as amended at §28 U.S.C. 1738B (1994)).  But Congress may not, under the guise of the Commerce Power, criminalize the failure to obey a state court order when the State itself has declined to do so. Such legislation does considerable violence to state regulation by fragmenting the state courts' ability to announce judgments and their ability to determine the sanction that will attend disobedience of those judgments.  Absent a stronger connection with the commercial concerns that are central to the Commerce Clause, this intrusion disrupts the federal balance that the Framers envisioned and that we are obliged to enforce. *Lopez*, 514 U.S. at 583 (Kennedy, J., concurring). The order of the district court is therefore REVERSED.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0337P (6th Cir.)
File Name:  00a0337p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

            v.                                    No. 98-2337

TIMOTHY GORDON FAASSE,
  *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 98-00185—Robert Holmes Bell, District Judge.

Submitted:  June 18, 1999

Decided and Filed:  September 25, 2000

Before:  BOGGS, NORRIS, and BATCHELDER, Circuit Judges.

———————

### COUNSEL

**ON BRIEF:**  Christopher P. Yates, FEDERAL PUBLIC DEFENDERS OFFICE, Grand Rapids, Michigan, for Appellant.  Thomas J. Gezon, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

———————————

## OPINION

———————————

ALICE M. BATCHELDER, Circuit Judge.   This case requires us to decide whether the Commerce Clause empowers Congress to criminalize the failure to obey a state court order when the State itself has declined to do so.  We hold that the Commerce Clause does not invest Congress with such a power.

### I.  Background

Timothy Gordon Faasse and Sandra Bowman met in a Michigan video store in 1989.  The couple began dating, and in 1990, Bowman became pregnant.  That summer, Faasse and Bowman visited California, Arizona, and Texas in order to find a place to work and live.  They were unsuccessful and returned to Michigan, where they settled in Lansing.  Bowman gave birth to a daughter, Noelle, in December of 1990.

Seven months later, the couple again discussed the possibility of moving "out West."  Bowman decided that she wished to remain in Michigan near her family.  Faasse felt that the education and employment opportunities were better in California, and he moved to San Diego in June of 1991.  Noelle remained with Bowman.

The following year, Faasse filed in Michigan court a petition to establish paternity of Noelle.  The state court agreed that Faasse was Noelle's father, and ordered him to make weekly child support payments of $58.25.  The order, entered on January 11, 1994, made the support obligation retroactive to December 1992.  As a result, Faasse began his payments $5,391.00 in arrears.  The Michigan court would later increase the support order to $125.00 per week.

Faasse's child support payments were erratic.  In 1994, he made four payments totaling $633.00.  In 1995, he made ten

example of Commerce Clause authority." *Lopez*, 514 U.S. at 560.  But the Supreme Court has made clear that *Wickard* applies to laws that are "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. *Id.* at 561.  Such is not the case here.  The CSRA does not treat a situation involving the "aggregate effect" of potential market participants' refusing to participate in commerce—in no small part because child support orders are not commercial. Moreover, we have considerable doubt that, as a factual matter, court-ordered transfers of wealth from one State to another affect interstate commerce.  In the aggregate, any given state  should have about as much money from support payments leaving its borders as entering.  *See* Recent Case, 110 Harv. L. Rev. 965, 968 (1997).  "Thus, the amount of goods bought in each state relative to other states should be basically  unchanged,  and  interstate  commerce  left unaffected." *Id.*

Likewise, federal regulatory jurisdiction cannot be founded on the possibility that nonpayment of support orders might cause individual citizens to become dependent on programs funded with federal money.  Taken to its logical conclusion, this reasoning would allow Congress to regulate activity of any person that depletes another person's assets and, at bottom, is no different from the "costs of crime" and "national productivity" arguments already rejected by the Supreme Court. *See Lopez*, 514 U.S. at 563-68.  What the Court said in *Lopez* holds true here as well:  "To uphold the[se] contentions . . . , we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 567.  Accordingly, we conclude that the CSRA is not a valid regulation of interstate commerce under *Lopez*'s third and final category.

the absence of a mechanism that would link particular support obligations to some sort of economic enterprise, sustaining the constitutionality of the CSRA on the basis of its current jurisdictional nexus would require paring the "Interstate Commerce Clause" to the "Interstate Clause." *See id.* This, of course, we cannot do.

The manner in which the activity regulated by the CSRA substantially affects interstate commerce is therefore opaque. "[T]o the extent that congressional findings would enable us to evaluate the legislative judgment that the failure to satisfy child support obligations substantially affects interstate commerce, they are lacking here." *Lopez*, 514 U.S. at 563. It is possible to infer from the legislative history that approximately $1.6 billion in interstate child support obligations go unpaid annually, and that Congress believed that some families were driven to federal public assistance as a result of unpaid child support. *See* H.R. Rep. 102-771, at 5 (1992) (observing that $5 billion in support obligations are not met each year, and that approximately one-third of child support cases concern children whose fathers live in a different state). These observations do not amount to a congressional conclusion that unpaid child support substantially affects interstate commerce, however, and we would not accept that conclusion based on such findings in any event. *See United States v. Morrison*, 120 S. Ct. 1740, 1752 (2000) (noting that "whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question").

First, the mere fact that the aggregate social costs of an activity come to a large dollar figure cannot, without more, satisfy the jurisdictional requirement that the activity have a substantial relationship to interstate commerce. *See id.* at 1754. The notion that the commerce power includes regulation of activities that are connected with a commercial transaction which, viewed in the aggregate, substantially affects interstate commerce stems from *Wickard v. Filburn*, 317 U.S. 111, 128 (1942), "perhaps the most far reaching

payments for a total of $1175.00. Faasse made ten more payments in 1996; these came to $690.00. The following year brought payments of $5390.00 in seven instalments. In 1998, Faasse made one payment of $100.00. By September of that year, his arrearage had grown to $28,313.35.

United States Marshals arrested Faasse in southern California on August 15, 1997. He was charged with one count of willful failure to pay past due child support, in violation of the Child Support Recovery Act ("CSRA"), 18 U.S.C. § 228 (1994). The matter was referred to a magistrate judge, before whom Faasse pled guilty. The magistrate judge accepted Faasse's plea and sentenced him to six months' imprisonment, the statutory maximum, and ordered him to make restitution of $28,438.35. Faasse appealed to the United States District Court for the Western District of Michigan, arguing that enactment of the CSRA exceeded Congress's authority under the Commerce Clause, and that the magistrate judge had abused his discretion in ordering restitution in the full amount of the past-due child support obligation. The district court affirmed.

Before this court, Faasse renews his challenges to the constitutionality of the CSRA and to the restitution order. For the reasons set forth below, we conclude that the CSRA is not a proper exercise of Congress's power to regulate interstate commerce.

## II. The Child Support Recovery Act of 1992

The legislative history surrounding the CSRA reveals two principal concerns on the part of the law's drafters. First, Congress evidently wished to prevent non-custodial parents from fleeing across state lines to avoid paying their child support obligations. Second, Congress desired to recover those support payments that had not been made. The law that actually emerged from the 102nd Congress, however, reaches far beyond these stated goals. The slippage between the CSRA's text and its drafters' design ultimately renders the law constitutionally infirm.

House of Representatives bill 1241—which eventually would be come the CSRA—left the Judiciary Committee with a favorable recommendation. The Committee Report noted that about $5 billion in child support obligations went unpaid each year. H.R. Rep. 102-771, at 5 (1992). In approximately one-third of child support cases, the father lives in a state other than the state where the child or children live, the Report continued, and fifty-seven percent of custodial parents in interstate cases receive child support payments only occasionally, seldom, or never. *Id.* Suggesting that state enforcement was "tedious, cumbersome and slow," the Report advocated a federal remedy to take "the incentive out of moving interstate to avoid payment." *Id.* The Report concluded:

> The Committee believes that a child should be able to expect the most basic support from those who chose to bring the child into the world. That expectation should not end at the state line. The Committee further believes that the taxpayers of America should be able to expect that the burden of caring for these children will be placed on the shoulders of the parents where it rightfully belongs.

*Id.*

These sentiments were reiterated during the debates held the day after the Committee Report was released. Representatives supporting the bill observed that state enforcement efforts had been "hobbled by a labyrinth of extradition laws and snarls of redtape," and asserted that H.R. 1241 would strengthen rather than supplant state enforcement. 138 Cong. Rec. H7324-01, H7325 (Aug. 4, 1992) (statement of Rep. Schumer). The Representatives also worried that the burden of supporting children abandoned by deadbeat parents would fall on the American taxpayer through public assistance programs. *Id.* But running like a leitmotif throughout the debates is the understanding expressed by Congressman Ewing: that the bill would "make it a crime for a parent to cross State lines in order to avoid making court-ordered child support payments." *Id.* at H7326.

market" only at the margins, if at all. Indeed, the right to support payments is not freely alienable and, in some instances, the payments must be made to the State rather than directly to the ultimate beneficiary, further depriving them of potential to affect the market. *See, e.g.*, Mich. Comp. Laws Ann. § 552.452 (providing for payment of support to the office of the Michigan friend of the court). As a result, court-ordered wealth transfers to or from Michigan residents are not per se a fit object of the federal Commerce Power.

Despite the distinctly noncommercial nature of child support orders generally, there might exist a discrete set of failures to satisfy support obligations that "have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562. Had the CSRA an express jurisdictional element which might limit its reach to those failures, the Act might withstand constitutional scrutiny. *Id.* It does not. To be sure, the CSRA has a jurisdictional "hook": the obligor parent and beneficiary child must reside in different States. 18 U.S.C. § 228(a). But this requirement will not ensure, through case-by-case inquiry, that a given failure to pay affects interstate commerce. As an initial matter, it would seem that the CSRA will inevitably govern some purely intrastate transactions. To take an extreme example, a child might move to a State different from that of her divorced parents after attaining her majority. If her non-custodial parent were in arrears, he could presumably be prosecuted under the Act, even though the relationship that created the obligation had no interstate character at all, and even though the payments to the former custodial parent, if made, would not cross state lines. *See Sage*, 92 F.3d at 106 (coupling this hypothetical with the questionable observation that the government would not likely invoke the Act where the State could enforce its own order).

More significantly, by effectively predicating jurisdiction on mere diversity of residency, the Act "regulates every interstate obligation, without exception." *Bailey*, 115 F.3d at 1238 (Smith, J., dissenting). But, as we have already shown, child support obligations are not commercial in character. In

The activity criminalized by the CSRA is not commercial in nature. The most widely accepted general description of commerce is that given in *Gibbons v. Ogden*: "Commerce, undoubtedly, is traffic, but it is something more—it is intercourse. It describes the commercial intercourse between nations, and parts of nations in all its branches . . . ." *Gibbons*, 22 U.S. (9 Wheat.) 1, 189-90 (1824). As Judge Jerry Smith has pointed out, "intercourse" has as its distinguishing feature a notion of reciprocity. *Bailey*, 115 F.3d at 1236 (Smith, J., dissenting); *see also* Webster's New World Dictionary of the American Language 733, 734 (2d ed. 1972) (defining intercourse as "communication or dealings between or among people, countries, etc.: interchange of products, services, ideas, feelings, etc.," and interchange as "to give and take mutually; exchange . . . to put (each of two things) in the other's place. . . ."). This element of reciprocity—the mutual exchange of value motivated by economic self-interest—defines the marketplace which fosters social wealth. *See* Michael Klausner, *Corporations, Corporate Law, and Networks of Contracts,* 81 Va. L. Rev 757, 771 (1995) (noting the basic precept of welfare economics that competitive market forces optimize social wealth). And it is the wealth-creating aspect of markets that justifies a national commerce power in our federal system; as the Supreme Court reminds us, the "overriding requirement" of the Commerce Clause is a national common market. *Hunt v. Washington State Adver. Comm'n*, 432 U.S. 333, 350 (1977); *see also Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 803 (1976) (noting "the premise, well established by the history of the Commerce Clause, that this nation is a common market").

The failure to obey a state court order, of course, lacks this essential feature of reciprocity. This is so even where the order mandates a transfer of wealth, as do child support orders. "[P]ayment of child support is not conditioned on the performance of a reciprocal duty by the obligee, nor does it benefit the obligor." *Bailey*, 115 F.3d at 1236 (Smith, J., dissenting). Due to this unilateral, allocative character, support obligations can influence the "national common

Yet the text of the Child Support Recovery Act contains no mention of interstate flight, nor does it confine its reach to recovery of delinquent payments. At the time of Faasse's arrest and conviction, the Act provided in pertinent part:

(a)  Offense.--Whoever willfully fails to pay a past due support obligation with respect to a child who resides in another State shall be punished as provided in subsection (b).

(b)  Punishment.--The punishment for an offense under this section is–

(1) in the case of a first offense under this section, a fine under this title, imprisonment for not more than 6 months, or both; and

(2) in any other case, a fine under this title, imprisonment for not more than 2 years, or both.

(c)  Restitution.--As used in this section–

(1) the term "past due support obligation" means any amount–

(A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living; and

(B) that has remained unpaid for a period longer than one year, or is greater than $5,000; and

(2) the term "State" includes the District of Columbia, and any other possession or territory of the United States.

18 U.S.C. § 228 (1994), *amended by* 18 U.S.C.A. § 228 (2000).[1] This language is overinclusive; it predicates criminal

---

[1] The Act was amended in 1998, and now includes a provision criminalizing travel in interstate commerce with the intent to evade a support obligation. *See* 18 U.S.C.A. § 228(a)(2) (2000). It is the earlier version of the statute that is before this court.

jurisdiction not on flight across state lines, but on simple diversity of residence. The Act thus sweeps Faasse within its compass, though the record in this case is devoid of any indication that he moved to California to avoid his child support obligations. It is clear that the statute imposes liability even if it is the child who moved out of state rather than the non-custodial parent. *See, e.g.*, *United States v. Sage*, 92 F.3d 101 (2d Cir. 1996).

Similarly, the CSRA does far more than "remove the incentive" to move interstate to avoid payment. The CSRA criminalizes a situation that is not criminal in Michigan, simply because the defendant moved to another state, even if he moved to maintain the same, or attain a better, job, or moved to be closer to his family, or to obtain an education. Were the scope of the Act so restricted, it presumably would have been enacted pursuant to Congress's legislative authority under the Full Faith and Credit Clause, U.S. Const. art. IV, § 1, cl.2, since the Framers committed interstate enforcement of state court orders to that provision of the Constitution. *See* 3 Max Farrand, The Records of the Federal Convention of 1787, at 488 (1911) (statement of James Wilson) (remarking that if the Legislature were not empowered to declare the effect of state acts, records and judicial proceedings, "the provision would amount to nothing more than what now takes place among all Independent Nations"); *see also* The Federalist No. 42, at 287 (James Madison) (Jacob E. Cooke ed., 1961) ("The power of prescribing by general laws the manner in which the public acts, records and judicial proceedings shall be proved, and the effect they shall have in other States . . . may be rendered a very convenient instrument of justice, and be particularly beneficial on the borders of contiguous States, where the effects liable to justice, may be suddenly and secretly translated in any stage of the process, within a foreign jurisdiction."); *Green v. Sarmiento*, 10 F. Cas. 1117, 1119 (C.C.D. Pa. 1810) (No. 5,760) (Washington, J., sitting on circuit) ("[T]he power to limit the effect of [state] judicial proceedings, is undoubted; and it was wisely left to the discretion of congress, to regulate the degree of force to be given to such proceedings."). Instead, the Act

which Congress has authority to prevent. *See, e.g.*, *United States v. Mussari*, 95 F.3d 787, 790 (9th Cir. 1996). We would agree that Congress has power to remove impediments to interstate commerce. Thus, Congress may prohibit racial discrimination that obstructs the flow of interstate commerce, *see Heart of Atlanta Motel v. United States*, 379 U.S. 241, 253 (1964) (upholding the Civil Rights Act of 1964), prohibit violent actions that interfere with interstate commerce, *see United States v. Green*, 350 U.S. 415, 420 (1956) (upholding the Hobbs Act), and prohibit restraints of trade that obstruct interstate commerce, *see Standard Oil Co. v. United States*, 221 U.S. 1, 68 (1911) (upholding the Sherman Act). But this line of cases deals with active obstruction of the flow of interstate commerce; it does not stand for the more radical proposition that Congress is empowered to regulate the passive failure of individuals to engage in interstate commerce. *Bailey*, 115 F.3d at 1239 n.15 (Smith, J., dissenting). More importantly, the obstruction argument conflates the *Lopez* categories. A prohibition on obstruction of commerce does not regulate "a thing" in commerce, nor does obstruction constitute a "use" of the channels of interstate commerce under the common meaning of "use". *Id.* Rather, Congress has authority to prohibit activities that interfere with commerce because those activities, taken in the aggregate, substantially affect commerce. The CSRA must therefore stand or fall, like the Gun Free School Zones Act, as a regulation under *Lopez's* final category.

As discussed earlier, the Gun Free School Zones Act could not be sustained as a regulation of an activity that substantially affects interstate commerce for three reasons. Section 922(q) was a criminal statute that, by its terms, had nothing to do with any sort of economic enterprise; it contained no jurisdictional element that would have ensured, through case by case inquiry, that the activity in question affected interstate commerce; and it was passed without findings elaborating the link between the activity criminalized and interstate commerce. *Lopez*, 514 U.S at 561-63. The CSRA fails constitutional muster for precisely these same reasons.

rickety analogy between support obligations and debts, (although, as we demonstrate below, support obligations in fact have no commercial character at all) we know of no case that holds that Congress has plenary authority to regulate a debt merely because the obligor and obligee reside in different states.  Adherents of this theory rely on such pre-*Lopez* cases as *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282 (1921), and *Allenberg Cotton Co. v. Pittman*, 419 U.S. 20 (1974).  In these cases, the parties executed contracts for the sale of goods that were to be performed within the territorial limits of a particular state, but which contemplated that the goods would enter the flow of interstate commerce.  When these contracts were breached, the defendants asserted as a defense state laws prescribing conditions on which foreign corporations might do business in the state of contract.  The Supreme Court held that these business qualification laws, as applied, violated the Dormant Commerce Clause, saying "we think the transaction was in interstate commerce."  *Dahnke-Walker*, 257 U.S. at 292.  Tempting though it may be to apply this snippet in an analysis under *Lopez*'s second category, the Supreme Court itself has acknowledged that the clear import of *Dahnke-Walker* and *Allenberg Cotton* is that a State has no power "to prevent an engagement in interstate commerce within her limits, except by her leave."  *Sonneborn Bros. v. Cureton*, 262 U.S. 506, 514 (1923).  These cases in no way suggest that the federal legislature has regulatory jurisdiction with respect to the conduct of contracting parties on the basis of mere diversity of residency.  *See United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 545 (1944) (emphasizing that legal formulae devised to assess state power cannot "uncritically be accepted as trustworthy guides to determine Congressional power under the Commerce Clause").

Even if they did so suggest, still another obstacle stands in the way of the hypothesis that the CSRA regulates a "thing in interstate commerce."  Simply put, defendants in CSRA cases do not put something into the flow of interstate commerce; rather, they refuse to do so.  It has been argued that this refusal amounts to an "obstruction" of interstate commerce,

deters non-payment of child support by creating a criminal penalty.

Put simply, the CSRA is not about recovery of child support payments avoided by interstate flight.  Rather, the Act regulates, through the criminal law, obligations owed by one family member to another, using diversity of residence as a jurisdictional "hook."  This realization is troubling, for the States possess primary authority for defining and enforcing both the criminal law and the law of domestic relations.  As Thomas Jefferson wrote:

> [T]he Constitution of the United States, having delegated to Congress the power to punish treason, counterfeiting the securities and current coin of the United States, piracies, and felonies committed on the high seas, and offenses against the law of nations, and no other crimes whatsoever; and it being true as a general principle, and one of the amendments to the Constitution having also declared, that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people," therefore . . . all their other acts which assume to create, define, and punish crimes, other than those so enumerated in the Constitution, are altogether void, and of no force; and that the power to create, define, and punish such other crimes is reserved, and, of right appertains solely and exclusively to the respective States, each within its own territory.

Kentucky Resolutions, 2d Resolved cl. (1798), *reprinted in* The Portable Thomas Jefferson 281, 282 (Merrill Peterson ed. 1979); *see also Patterson v. New York*, 432 U.S. 197, 201 (1977) (stating that "preventing and dealing with crime is much more the business of the States than it is of the Federal Government").  In a like vein, the courts have consistently recognized that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not the laws of the United States."  *Ex parte Burrus*, 136 U.S. 586, 593-94 (1890); *see also Sosna v. Iowa*,

419 U.S. 393, 404 (1975) (stating that the "regulation of domestic relations . . . has long been regarded as a virtually exclusive province of the States"); *cf. Ankenbrandt v. Richards*, 504 U.S. 689 (1992) (recognizing a domestic relations exception to the diversity jurisdiction of the federal courts in view of long-held understandings and sound policy considerations).

In this case, the CSRA's encroachment on these traditional preserves of state authority does considerable damage to Michigan's finely wrought scheme for regulating child support. In light of the traditional notions of federalism and in the wake of the watershed case of *United States v. Lopez*, 514 U.S. 549 (1995), we cannot conclude that the Commerce Clause countenances such damage.

## III.  The Constitutional Balance of Federalism

### A.  State Law and the CSRA

The Supreme Court has observed that when "Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction'."    *United States v. Lopez,* 574 U.S. 549, 563 n.3, (quoting *United States v. Enmons*, 410 U.S. 396, 411-12 (1973)). Ironically, it may be that state power suffers greater disruption when Congress criminalizes conduct that the States have chosen not to criminalize but to regulate in a different fashion, for the federal law assigns to the conduct new costs that differ not just in quantum, but in kind, from the costs defined by the State. Such is the case here.

Although Michigan has a felony desertion statute on its books, it is rarely enforced and, in any case, it does not link criminal liability to judicial child support orders. *See* Mich. Comp. Laws Ann. § 750.161 (West 1991) (providing liability for refusing "to provide necessary and proper shelter, food, care, and clothing for . . . his or her children under 17 years of age"). Civil child support enforcement methods "account for virtually all enforcement activity in Michigan." Scott G.

We admit to some confusion with respect to the notion that the CSRA regulates the use of the channels of interstate commerce. The term "channel of interstate commerce" refers to, *inter alia*, "navigable rivers, lakes, and canals of the United States; the interstate railroad track system; the interstate highway system; . . . interstate telephone and telegraph lines; air traffic routes; television and radio broadcast frequencies." *Gibbs v. Babbitt*, 214 F.3d 483, 490-91 (4th Cir. 2000) (alteration in original) (internal quotation marks omitted). Congress has broad authority with respect to these channels; not only may the Legislature regulate them directly, it may act to keep them "free from immoral and injurious uses." *Caminetti v. United States*, 242 U.S. 470, 491 (1917). But Congress does not act pursuant to this authority when it regulates an activity that merely "implicates" or "invokes" the use of the channels of interstate commerce. *Cf. United States v. Bailey*, 115 F.3d 1222, 1227 (5th Cir. 1997). Thus, we held in *United States v. Abdullah* that the ban on trafficking in contraband cigarettes found at 18 U.S.C. §§ 2341-46 does not fall within the first *Lopez* category because the *purpose* of the ban is not "to keep open the very avenues by which interstate commerce is transacted." *Abdullah*, 162 F.3d 897, 901 (6th Cir. 1998). Indeed, to hold otherwise would be to collapse the first and second *Lopez* categories; any regulation of a thing in interstate commerce would necessarily be a regulation of the use of the channels of interstate commerce. Because we assume that the Supreme Court did not idly draw the distinctions that it did, we cannot agree that the CSRA regulates the channels of interstate commerce merely by criminalizing the failure to make support payments which, if made, would normally enter the flow of interstate commerce.

Similarly unpersuasive is the argument that the CSRA regulates a thing in interstate commerce. This contention relies on an analogy between child support obligations and interstate debts, and on the further supposition that Congress may compel payment of debts through its power to prevent obstruction of interstate commerce. We find neither half of this contention compelling. Accepting for the moment the

of whether the regulated activity 'substantially affects' interstate commerce." *Id*. at 559. Having clarified that point, the Court concluded that several critical factors prevented § 922(q)(1)(A) from qualifying as a valid exercise of congressional authority under the third category. First, since § 922(q)(1)(A) did not regulate a commercial activity, the statute could not be upheld as regulating "activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* at 561. Further, the statute contained no "jurisdictional element which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce." *Id.* Finally, the statute was not supported by specific "congressional findings [that] would enable [the Court] to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye." *Id.* at 563.

It has been argued that the CSRA falls within all three *Lopez* categories. Because payment of child support on behalf of an out-of-state child will normally require the use of channels of interstate commerce, one argument goes, the CSRA is constitutional under the first *Lopez* category. *See, e.g.*, *United States v. Crawford*, 115 F.3d 1397, 1400 (8th Cir. 1997). Another thesis likens child support obligations to interstate debts or contracts, and asserts that Congress's authority to prevent obstruction of interstate commerce empowers it to criminalize nonpayment. *See, e.g.*, *United States v. Bongiorno*, 106 F.3d 1027, 1032 (1st Cir. 1997); *United States v. Sage*, 92 F.3d 101, 105-06 (2d Cir. 1996). Yet a third maintains that because the obligations covered by the CSRA, in the aggregate, total billions of dollars, the Act regulates an activity that substantially affects interstate commerce. *See, e.g.*, *United States v. Parker*, 108 F.3d 28, 30-31 (3d Cir. 1997). Any of these theories would permit the creation of a federal law of ordinary private debt, whenever one party moved out of state after the debt was created. We find each of these arguments unpersuasive.

Bassett, *Family Law, Annual Survey of Michigan Law June 1, 1990-May 31, 1991*, 38 Wayne L. Rev. 1045, 1070 (1992). Michigan Law commits to the discretion of state judges the means by which to enforce—or to deter failure to obey—a support order. A circuit court judge may incarcerate a person for child nonsupport, but this remedy is civil in nature. *See* Mich. Comp. Laws Ann. § 552.635; *Mead v. Batchlor*, 460 N.W.2d 493, 500 n.15 (Mich. 1990) ("Clearly, it was intended that the Michigan statutory procedure authorizing incarceration for child nonsupport should be regarded as civil in nature."). Furthermore, the judge's discretion in this regard is carefully cabined; an order of incarceration may be entered only if other remedies—such as income withholding, interception of tax refunds, and property liens—"appear unlikely to correct the payer's failure or refusal to pay support." Mich. Comp. Laws Ann. § 552.637(1).

The CSRA disrupts this delicate scheme. By creating a federal criminal penalty/deterrent for disobedience of support orders in some circumstances, the Act renders nugatory the discretion invested in Michigan circuit court judges. Moreover, these judges are subject to election, *see* Mich. Const. art 6, § 11, and the contours of their discretion are determined by an elected legislature; the CSRA thus prevents Michigan officials from regulating in accordance with the views of the local electorate. *See New York v. United States*, 505 U.S. 144, 168-69 (1992) (noting that where Congress encourages state regulation rather than compelling it, state officials remain accountable to the people, but that accountability is diminished when, due to federal interference, "elected state officials cannot regulate in accordance with the view of the local electorate in matters not pre-empted by federal regulation"). In essence, the Act carves up Michigan law by predicating liability on violations of Michigan court orders, but putting deterrence and penalty decisions into the hands of United States officials in that minority of cases in which the state of residence of the payer is different from that of the child.

This federal legislative choice is particularly unsettling given that Congressional power to disturb state regulatory programs has customarily been thought to fall into three categories, into none of which the CSRA comfortably fits. Congress may, pursuant to its spending power, influence a State's regulatory decisions by attaching conditions to the receipt of federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). Congress may also craft programs of "cooperative federalism" that offer a State the choice of regulating according to federal standards or having state law pre-empted by federal regulation. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 288-89 (1981). Finally, Congress may, of course, pre-empt outright state laws regulating private activity that otherwise fall within the enumerated powers of the Constitution. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947).

In enacting the CSRA, Congress has followed none of these well-trodden paths. Although the Act does authorize grants to States to coordinate interstate child support enforcement effort, *see* 42 U.S.C.A. § 3796cc (West 1994), these monies are not tethered to the criminal provisions of the legislation. The States' ability to assign social and other costs to the disobedience of child support orders is emasculated regardless of whether they accept federal funds. Similarly, the States have no choice between devising remedies within minimum federal standards or having their child support laws pre-empted. Indeed, the CSRA creates no pre-emption issue; the Act is founded on the existence of state court orders, not their displacement. By piggybacking a criminal sanction on Michigan child support orders, the CSRA recognizes the primacy of the State's laws at the same time that it expressly overrides portions of such laws.

The Constitution diffuses power to protect the citizenry against just such attempts to fragment official action from political accountability. *See* The Federalist No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1969) ("In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments control each other, at the same time that each is controlled by itself.") Among the structural protections of the Constitution is the doctrine of enumerated powers, and the Commerce Clause figures prominently among these. Although judicial efforts to maintain the federal balance through exposition of the Commerce Clause have "taken some turns," *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995), the Supreme Court has recently reaffirmed in *United States v. Lopez* that there are some activities that States may regulate but Congress may not.

## B.   The Commerce Clause

In *Lopez*, the Supreme Court struck down the Gun Free School Zones Act, 18 U.S.C. § 922(q)(1)(A), which prohibited " 'any individual knowingly to possess a firearm at a place [he] knows ... is a school zone,' " as an unconstitutional exercise of Congress' power under the Commerce Clause. *United States v. Lopez*, 514 U.S. 549, 551 (1995). That power, the Court observed, only extends to only three types of activity: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) those activities having a substantial relation to interstate commerce, namely, those activities that substantially affect interstate commerce. *Id.* at 558- 59. Since § 922(q)(1)(A) did not involve channels or instrumentalities of interstate commerce, the Court reasoned that the statute would be constitutional only if it qualified under the third category, as a statute that regulated an activity which substantially affected interstate commerce. *Id.* at 559.

In considering that question, the Court recognized that its case law had not always been clear as to whether an activity must "affect" or "substantially affect" interstate commerce. The Court then explained that "consistent with the great weight of our case law ... the proper test requires an analysis