RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0324P (6th Cir.)
File Name: 01a0324p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

*v.*
                         No. 98-2337

TIMOTHY GORDON FAASSE,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 98-00185—Robert Holmes Bell, Chief District Judge.

Argued: March 7, 2001

Decided and Filed: September 14, 2001

Before: MARTIN, Chief Judge; MERRITT, BOGGS,
NORRIS, SUHRHEINRICH, SILER, BATCHELDER,
DAUGHTREY, MOORE, COLE, CLAY, and GILMAN,
Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Christopher P. Yates, FEDERAL PUBLIC
DEFENDERS OFFICE, Grand Rapids, Michigan, for
Appellant. Michael R. Dreeben, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D. C., for
Appellee. **ON BRIEF:** Christopher P. Yates, FEDERAL

1

PUBLIC DEFENDERS OFFICE, Grand Rapids, Michigan, for Appellant.  Michael R. Dreeben, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Deborah Watson, UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION, CRIMINAL DIVISION, Washington, D.C., for Appellee.

MOORE, J., delivered the opinion of the court, in which MARTIN, C. J., MERRITT, SILER, DAUGHTREY, COLE, CLAY, and GILMAN, JJ., joined.  BATCHELDER, J. (pp. 29-47), delivered a separate dissenting opinion, in which BOGGS, NORRIS, and SUHRHEINRICH, JJ., joined.

———————

**OPINION**

———————

KAREN NELSON MOORE, Circuit Judge.  In response to "the growing problem of interstate enforcement of child support," Congress passed the Child Support Recovery Act of 1992 ("CSRA"), Pub. L. No. 102-521, § 2(a), 106 Stat. 340 (codified at 18 U.S.C. § 228 (1994)), to "punish[] certain persons who intentionally fail to pay their child support obligations." H.R. REP. NO. 102-771, at 4 (1992).  This case presents the question whether the CSRA is a valid exercise of Congress's Commerce Clause power under Article I, § 8, cl. 3 of the Constitution.  Timothy Gordon Faasse pleaded guilty to violating the CSRA, which criminalizes the willful failure to pay court-ordered child support for a child who resides in another state.  He was sentenced by the district court to serve a six-month term of imprisonment and ordered to pay full restitution for past-due support payments. He now challenges the constitutionality of the statute as well as the legality of the district court's restitution order.  All ten of our sister circuits that have considered the constitutionality of the CSRA in Commerce Clause challenges after *United States v. Lopez*, 514 U.S. 549 (1995), have upheld the statute.  We now join them in concluding that the CSRA is an appropriate exercise of Congress's power under the Commerce Clause.  Therefore, we **AFFIRM** the judgment of the district court as to the

hands of United States officials in that minority of cases in which the state of residence of the payer is different from that of the child.

In *United States v. Morrison* the Supreme Court warned against overly elastic conceptions of the Commerce Clause that would give Congress authority over "family law and other areas of traditional state regulation since the aggregate effect of marriage, divorce, and childrearing on the national economy is undoubtedly significant." *Morrison*, 120 S. Ct. at 1744.  Mindful of this admonition, I would hold that the provisions of the Child Support Recovery Act of 1992 contained in 18 U.S.C. §228 (1994), exceed Congress's authority under the Constitution.  It is important to note that such a ruling would not prevent Congress from assisting the states in obtaining interstate enforcement of their courts' orders.  Congress can do so (and has done so) pursuant to the Full Faith and Credit Clause.  *See* Full Faith and Credit for Child Support Orders Act, Pub. L. No. 103-383, 108 Stat. 4064 (1994) (codified as amended at §28 U.S.C. 1738B (1994)).  But Congress may not, under the guise of the commerce power, criminalize the failure to obey a state court order when the state itself has declined to do so.  Such legislation does considerable violence to state regulation by fragmenting the state courts' ability to announce judgments and their ability to determine the sanction that will attend disobedience of those judgments.  Absent a stronger connection with the commercial concerns that are central to the Commerce Clause, this intrusion disrupts the federal balance that the Framers envisioned.  *See Lopez*, 514 U.S. at 583 (Kennedy, J., concurring).

for refusing "to provide necessary and proper shelter, food, care, and clothing for . . . his or her children under 17 years of age"). Civil child support enforcement methods "account for virtually all enforcement activity in Michigan." Scott G. Bassett, *Family Law, Annual Survey of Michigan Law June 1, 1990-May 31, 1991*, 38 Wayne L. Rev. 1045, 1070 (1992). Michigan law commits to the discretion of state judges the means by which to enforce—or to deter failure to obey—a support order. A circuit court judge may incarcerate a person for child nonsupport, but this remedy is civil in nature. *See* Mich. Comp. Laws Ann. § 552.635 (West 2001); *Mead v. Batchlor*, 460 N.W.2d 493, 500 n.15 (Mich. 1990) ("Clearly, it was intended that the Michigan statutory procedure authorizing incarceration for child nonsupport should be regarded as civil in nature."). Furthermore, the judge's discretion in this regard is carefully cabined; an order of incarceration may be entered only if other remedies—such as income withholding, interception of tax refunds, and property liens—"appear unlikely to correct the payer's failure or refusal to pay support." Mich. Comp. Laws Ann. § 552.637(1) (West 2001).

The CSRA disrupts the state scheme. By creating a federal criminal penalty as a deterrent for disobedience of support orders in some circumstances, the Act renders nugatory the discretion invested in Michigan circuit court judges. Moreover, these judges are subject to election, *see* Mich. Const. art 6, § 11, and the contours of their discretion are determined by an elected legislature; the CSRA thus prevents Michigan officials from regulating in accordance with the views of the local electorate. *See New York v. United States*, 505 U.S. 144, 168-69 (1992) (noting that where Congress encourages state regulation rather than compelling it, state officials remain accountable to the people, but that accountability is diminished when, due to federal interference, "elected state officials cannot regulate in accordance with the view of the local electorate in matters not pre-empted by federal regulation"). In essence, the Act carves up Michigan law by predicating liability on violations of Michigan court orders, but putting deterrence and penalty decisions into the

constitutionality of the statute; we also **AFFIRM** the district court's order of restitution.

## I.  FACTS

Timothy Gordon Faasse and Sandra Bowman had a child, Noelle Alexandria Faasse, on December 23, 1990. The couple resided in Lansing, Michigan for the first several months of Noelle's life. In June 1991, Faasse moved to California; Bowman chose to remain in Michigan with Noelle. In June 1992, Faasse filed a petition in state court to establish his paternity of Noelle as well as visitation rights. The circuit court in Kent County, Michigan adjudged Faasse to be Noelle's father on January 11, 1994; it also ordered Faasse to pay child support in the amount of $58.25 per week.[1] The child support order was made retroactive to December 1992. As a result of the retroactive nature of the award, Faasse found himself $5,391 in arrears on child support.

Faasse was intermittently employed in California[2] and his child support payments were sporadic: in 1994, Faasse made four payments to Bowman totaling $633; in 1995, he sent ten payments in the amount of $1,175; in 1996, Faasse provided payments of $690; in 1997, Faasse sent seven payments totaling $5,390; and in 1998, Faasse made one payment of $100.

On July 17, 1997, the government filed a criminal complaint against Faasse in the United States District Court for the Western District of Michigan alleging that Faasse was in violation of the Child Support Recovery Act for failure to pay court-ordered child support from January 1994 to July

---

[1] In August 1995, the county circuit court raised the award to $125 per week.

[2] As a result of Faasse's unwillingness to provide the probation officer assigned to his case with financial records, Faasse's employment and earnings history are incompletely reported in his presentence report.

1997.  On June 10, 1998, Faasse pleaded guilty before a magistrate judge to one count of violating the CSRA.  The CSRA at that time provided: "[w]hoever willfully fails to pay a past due support obligation with respect to a child who resides in another State shall be punished as provided in subsection (b)."  18 U.S.C. § 228(a) (1994).[3]  Subsection (b) stated that punishment for a first offense under subsection (a) was a fine, imprisonment for not more than 6 months, or both; and for a subsequent offense, a fine, imprisonment for not more than two years, or both.  *Id.* § 228(b)(1), (2) (1994).  The term "past due support obligation" was defined as "any amount —

(A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living; and

(B) that has remained unpaid for a period longer than one year, or is greater than $5,000 . . . .

---

[3] The CSRA was subsequently amended in June 1998 by the Deadbeat Parents Punishment Act of 1998, Pub. L. No. 105-187, § 2, 112 Stat. 618.  The CSRA currently provides punishment for "[a]ny person who —
   (1) willfully fails to pay a support obligation with respect to a child who resides in another State, if such obligation has remained unpaid for a period longer than 1 year, or is greater than $5,000;
   (2) travels in interstate or foreign commerce with the intent to evade a support obligation, if such obligation has remained unpaid for a period longer than 1 year, or is greater than $5,000; or
   (3) willfully fails to pay a support obligation with respect to a child who resides in another State, if such obligation has remained unpaid for a period longer than 2 years, or is greater than $10,000 . . . ."
18 U.S.C. § 228(a).  Faasse was convicted and sentenced under the prior version of the Act.

tethered to the criminal provisions of the legislation.  The Act emasculates the states' ability to assign social and other costs to the disobedience of child support orders regardless of whether the states accept federal funds.  And, unlike the federal government's use of highway funds to force the states to make changes in their laws governing the consumption of alcoholic beverages, the CSRA does not offer the states the choice between devising remedies within minimum federal standards and having federal funds withheld.  Indeed, the CSRA creates no pre-emption issue; the Act is founded on the existence of state court orders, not their displacement.  By piggybacking a criminal sanction on the states' child support orders, the CSRA recognizes the primacy of the states' laws at the same time that it expressly overrides portions of those laws.

The Constitution diffuses power to protect the citizenry against just such attempts to fragment official action from political accountability.  *See* The Federalist No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1969) ("In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments.  Hence a double security arises to the rights of the people.  The different governments control each other, at the same time that each is controlled by itself.").  Among the structural protections of the Constitution is the doctrine of enumerated powers, and the Commerce Clause figures prominently among these.  Although judicial efforts to maintain the federal balance through exposition of the Commerce Clause have "taken some turns," *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995), the Supreme Court reaffirmed in *United States v. Lopez* that there are some activities that states may regulate but Congress may not.

Although Michigan has a felony desertion statute on its books, it is rarely enforced and, in any case, it does not link criminal liability to judicial child support orders.  *See* Mich. Comp. Laws Ann. § 750.161 (West 1991) (providing liability

In this case, the CSRA's encroachment on these traditional preserves of state authority does considerable damage to Michigan's system for regulating child support, which was enacted by its legislature and applied by its elected judges. In light of the traditional notions of federalism and in the wake of *Lopez*, I cannot conclude that the Commerce Clause countenances such damage. The Supreme Court has observed that when "Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction'." *United States v. Lopez,* 574 U.S. 549, 563 n.3, (quoting *United States v. Enmons*, 410 U.S. 396, 411-12 (1973)). Ironically, it may be that state power suffers greater disruption when Congress criminalizes conduct that the states have chosen not to criminalize but to regulate in a different fashion, for the federal law assigns to the conduct new costs that differ not just in quantum, but in kind, from the costs defined by the state. Such is the case here.

This federal legislative choice is particularly unsettling given that congressional power to disturb state regulatory programs has customarily been thought to fall into three categories, into none of which the CSRA comfortably fits. Congress may, pursuant to its spending power, influence a state's regulatory decisions by attaching conditions to the receipt of federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). Congress may also craft programs of "cooperative federalism" that offer a state the choice of regulating according to national standards or having state law pre-empted by federal regulation. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 288-89 (1981). Finally, Congress may, of course, preempt outright state laws regulating private activity that is within the enumerated powers of the Constitution. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947).

In enacting the CSRA, Congress has followed none of these well-trodden paths. Although the Act does authorize grants to states to coordinate interstate child support enforcement efforts, *see* 42 U.S.C. § 3796cc (1994), these monies are not

*Id.* § 228(d)(1). Faasse was subsequently sentenced by a magistrate judge to a term of 6 months' imprisonment and ordered to pay full restitution, in the amount of $28,438.35, for child support arrearage.

Faasse timely appealed his conviction and sentence to this court.[4] He first challenges the constitutionality of the CSRA as an improper exercise of Congress's Commerce Clause authority. Faasse attacks the statute's nexus to interstate commerce, asserting that the CSRA creates a "federal criminal enforcement mechanism for pure state law child support obligations" whose only link to interstate commerce is the requirement that parent and child reside in different states. Appellant's Br. at 9. According to Faasse, this link is insufficient to establish a constitutional basis for Congressional regulation. Faasse also challenges the district court's order requiring him to pay restitution as an abuse of the district court's discretion. A panel of this court initially accepted Faasse's arguments and reversed the district court's judgment. *United States v. Faasse*, 227 F.3d 660, 672 (6th Cir. 2000). We granted rehearing en banc, vacated the panel opinion, 234 F.3d 312 (6th Cir. 2000), and now affirm the judgment of the district court.

## II. ANALYSIS

The Constitution grants Congress the power to regulate commerce among the several states. U.S. CONST. art. I, § 8, cl. 3. Relying on *United States v. Lopez*, 514 U.S. 549 (1995), Faasse urges us to fashion a narrow and technical definition of commerce that turns on whether the transaction at issue involves trade and is reciprocal in nature. We firmly decline Faasse's invitation to impose heretofore unknown constraints on Congress's Commerce Clause power as

---

[4] Faasse first appealed his conviction and sentence to the district court in the Western District of Michigan, pursuant to Fed. R. Crim. P. 58(g)(2)(D). The district court issued an opinion and order upholding the constitutionality of the CSRA and affirming Faasse's sentence and restitution order.

unsupportable by either Supreme Court or our own precedent. Indeed, we believe that, pursuant to our de novo review of the constitutionality of a statute, *United States v. Napier*, 233 F.3d 394, 397 (6th Cir. 2000), the CSRA easily passes constitutional muster.

## A.  Commerce Clause

In one of the Supreme Court's earliest expositions on the Commerce Clause, Chief Justice Marshall rejected the notion that "commerce," as utilized in the Constitution, is limited "to traffic, to buying and selling, or the interchange of commodities . . . ." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 189 (1824). The Chief Justice noted that "[c]ommerce, undoubtedly, is traffic, but it is something more; it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." *Id.* at 189-90. Although the Supreme Court's reliance on this early understanding of commerce has waxed and waned in the course of this nation's development, it remains the principal standard by which we evaluate Commerce Clause challenges. While we must remain vigilant to ensure that a federal statute does not trench upon purely local activity, we may only invalidate a congressional enactment passed pursuant to the Commerce Clause if it bears no rational relation to interstate commerce. *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276 (1981).

In *United States v. Lopez* the Supreme Court revealed its concern that Congress had so expanded its authority to regulate *intra*state activity under the guise of its Commerce Clause power that Congress was in danger of "effectually obliterat[ing] the distinction between what is national and what is local and creat[ing] a completely centralized government." *Lopez*, 514 U.S. at 557 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). Summarizing its prior Commerce Clause jurisprudence, the Court articulated "three broad categories of activity that

constitutional authority to regulate non-commercial relationships. Here, the majority wrongly focuses on the pervasiveness of parents' failure to obey child support orders, the difficulty states have in enforcing such obligations, and the unhappy consequences to a child when his parent is derelict in his or her parental duties. There is no question that the non-payment of child-support is a problem of national proportions. To the extent that state boundaries make support-payment recovery more difficult, it is an interstate problem.

However, as *Lopez* and *Morrison* make clear, Congress's jurisdiction is not premised on the severity of a problem, its susceptibility to a federal solution, or the fact that a federal solution might be more convenient. The failure of a parent to comply with a child-support order does not burden commerce among the states in any way. It does not erect the barriers to trade that the Founders so feared. Nor does the failure to comply with a state support order allow the channels of interstate commerce to be used for some nefarious or dangerous purpose. Moreover, the failure to pay child support interstate has no effect on any national scheme of economic regulation and does not "substantially affect" interstate commerce. In fact, the economic impact of failure to pay child-support intrastate is indistinguishable from the failure to pay after one has moved out-of-state.

It is beyond dispute that willful non-compliance with support orders has a detrimental, often devastating effect on single parents who depend on the payments to make ends meat. Likewise, a victim of crime, such as the plaintiff in *Morrison*, suffers psychological and emotional scars beyond calculation, but which, for purposes of the justice we are able to provide, might be converted into dollars and cents. However, the Supreme Court has refused to construe these individual losses, even when they are aggregated into terms such as "costs of crime" and lost productivity, as offenses against the American commercial system. *See Lopez*, 514 U.S. at 563-568.

regulation of interstate commerce under *Lopez's* third and final category.

The majority discusses at length the pervasive and interstate nature of the child support delinquency problem and recognizes that throughout its history, Congress has exercised its positive power under the Commerce Clause to enact "legislation to help the States solve problems that defy local solution." However, the majority fails to note that the authority to enact these laws flowed from the relationship between the proposed regulation and interstate commerce, clearly ascertainable under one of the *Lopez* categories, and not the difficulty or interstate nature of the problem. For example, federal laws prohibiting loan sharking were held permissible because loan sharking and the attendant organized crime interferes with interstate commercial activity, not merely because the problem defied state solutions. *See Perez v. United States*, 402 U.S. 146, 150 (1970). The other instances cited by the majority, where the courts have upheld congressional authority to regulate the channels of interstate commerce, fall into the category of regulations to prevent the federally maintained channels from being used for immoral or illegal purposes. The National Stolen Property Act, 18 U.S.C. §§ 413-19, cited by the majority, provides an example of regulation designed to prevent criminals from profiting from the open channels of interstate commerce. Further, courts have upheld regulations, such as the Hobbs Act, aimed at protecting commerce itself. These regulations defend the integrity and reliability of the channels of interstate commerce, and congressional authority to enact them flows from the constitutional charge to "regulate Commerce among the several States."

It might in fact be more convenient in the context of today's highly mobile society and shifting mores if Congress enacted uniform laws for child support, child custody and spousal support that could be universally applied and easily enforced without regard to state boundaries. That federal solutions to various social problems might prove efficacious and convenient, however, does not confer upon Congress the

Congress may regulate under its commerce power[:] First, Congress may regulate the use of the channels of interstate commerce." *Id.* at 558 (internal citations omitted). This category includes "an attempt to prohibit the interstate transportation of a commodity through the channels of commerce." *Id.* at 559. "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* at 558. Third, Congress may "regulate those activities having a substantial relation to interstate commerce." *Id.* at 558-59. Although these broad categories may "not satisfy those who seek mathematical or rigid formulas," they are consistent with the modern Court's "practical conception of commercial regulation," *id.* at 573-74 (Kennedy, J., concurring), which continues to guide the Court's resolution of Commerce Clause challenges to federal statutes.

According to Faasse, Congress lacks the power under all three *Lopez* categories to enact the CSRA. We disagree. The CSRA regulates exclusively interstate cases involving a debtor parent's obligation to send court-ordered payments through interstate channels of commerce for a child residing in another state. We believe that, at the very least, the CSRA falls within Congress's power to regulate a "thing" in interstate commerce. Nine of the ten circuits to have upheld the CSRA have held similarly.[5] *See United States v. Bongiorno*, 106 F.3d 1027, 1033 (1st Cir. 1997) (upholding statute under *Lopez's* category two); *United States v. Sage*, 92 F.3d 101, 107 (2d Cir. 1996), *cert. denied*, 519 U.S. 1099 (1997); (upholding statute under category two); *United States v. Johnson*, 114 F.3d 476, 480 (4th Cir.), *cert. denied*, 522 U.S. 904 (1997) (upholding statute under category two); *United States v. Bailey*, 115 F.3d 1222, 1226 (5th Cir. 1997), *cert. denied*, 522 U.S. 1082 (1998) (upholding statute under categories one and two); *United States v. Black*, 125 F.3d 454,

---

[5] Only the Third Circuit's decision in *United States v. Parker*, 108 F.3d 28, 30 (3d Cir.), *cert. denied*, 522 U.S. 837 (1997), relies solely on *Lopez's* category three.

460 (7th Cir. 1997), *cert. denied*, 523 U.S. 1033 (1998) (upholding statute under category two); *United States v. Crawford*, 115 F.3d 1397, 1400 (8th Cir.), *cert. denied*, 522 U.S. 934 (1997) (upholding statute under all three categories); *United States v. Mussari*, 95 F.3d 787, 790 (9th Cir. 1996), *cert. denied*, 520 U.S. 1203 (1997) (upholding statute under category two); *United States v. Hampshire*, 95 F.3d 999, 1003 (10th Cir. 1996), *cert. denied*, 519 U.S. 1084 (1997) (upholding statute under categories two and three); *United States v. Williams*, 121 F.3d 615, 619 (11th Cir. 1997), *cert. denied*, 523 U.S. 1065 (1998) (upholding statute under category two). *Lopez* and its progeny simply do not cabin Congress's authority to prevent the obstruction of things in interstate commerce.

*Lopez* involved a challenge to the Gun-Free School Zones Act of 1990 ("GFSZA"), 18 U.S.C. § 922(q) (1994), which prohibited the knowing possession of a gun within 1,000 feet of a school. The Court quickly rejected the first two categories of authority as possible constitutional bases for Congress's enactment of the statute. Turning to the third category, the Court concluded that because the GFSZA was "a criminal statute that by its terms ha[d] nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms," the statute could not stand as a valid regulation under the Commerce Clause. *Lopez*, 514 U.S. at 561. The Court evaluated several factors in its assessment whether the GFSZA substantially affected interstate commerce despite the fact that "no such substantial effect was visible to the naked eye[:]" first, whether the statute was part of a larger regulation of economic activity in which the regulatory scheme could be undercut unless the intrastate activity were regulated; second, whether the statute contained a "jurisdiction element which would ensure, through case-by-case inquiry" that each firearm possession affected or had an explicit connection to interstate commerce; and third, whether the statute or its legislative history contained congressional findings regarding whether gun possession in a school zone affected interstate commerce. *Id.* at 561-63. Answering all three inquiries in the negative, the

satisfy the jurisdictional requirement that the activity have a substantial relationship to interstate commerce. *See id.* at 1754. The notion that the commerce power includes regulation of activities that are connected with a commercial transaction which, viewed in the aggregate, substantially affects interstate commerce stems from *Wickard v. Filburn*, 317 U.S. 111, 128 (1942), "perhaps the most far reaching example of Commerce Clause authority." *Lopez*, 514 U.S. at 560. But the Supreme Court has made clear that *Wickard* applies to laws that are "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* at 561. Such is not the case here. The CSRA does not address a situation involving the "aggregate effect" of potential market participants' refusal to participate in commerce—in no small part because child support orders are not commercial. Moreover, I have considerable doubt that, as a factual matter, court-ordered transfers of wealth from one state to another affect interstate commerce. In the aggregate, any given state should have about as much money from support payments leaving its borders as entering. *See* Recent Case, 110 Harv. L. Rev. 965, 968 (1997). "Thus, the amount of goods bought in each state relative to other states should be basically unchanged, and interstate commerce left unaffected." *Id.*

Likewise, federal regulatory jurisdiction cannot be founded on the possibility that nonpayment of support orders might cause individual citizens to become dependent on programs funded with federal money. Taken to its logical conclusion, this reasoning would allow Congress to regulate activity of any person that depletes another person's assets and, at bottom, is no different from the "costs of crime" and "national productivity" arguments already rejected by the Supreme Court. *See Lopez*, 514 U.S. at 563-68. What the Court said in *Lopez* holds true here as well: "To uphold the[se] contentions . . . , we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 567. Accordingly, I conclude that the CSRA is not a valid

As discussed earlier, the Gun Free School Zones Act could not be sustained as a regulation of an activity that substantially affects interstate commerce for three reasons. Section 922(q) was a criminal statute that, by its terms, had nothing to do with any sort of economic enterprise; it contained no jurisdictional element that would have ensured, through case by case inquiry, that the activity in question affected interstate commerce; and it was passed without findings elaborating the link between the activity criminalized and interstate commerce. *Lopez*, 514 U.S at 561-63. The CSRA fails constitutional muster for precisely these same reasons.

The manner in which the activity regulated by the CSRA substantially affects interstate commerce is unclear. "[T]o the extent that congressional findings would enable us to evaluate the legislative judgment that the [failure to satisfy child support obligations] substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here." *Lopez*, 514 U.S. at 563. It is possible to infer from the legislative history that approximately $1.6 billion in interstate child support obligations go unpaid annually, and that Congress believed that some families were driven to federal public assistance as a result of unpaid child support. *See* H.R. Rep. 102-771, at 5 (1992) (observing that $5 billion in support obligations are not met each year, and that approximately one-third of child support cases concern children whose fathers live in a different state). These observations do not amount to a congressional conclusion that unpaid child support substantially affects interstate commerce, however, and courts would not simply accept that conclusion based on such findings in any event. *See United States v. Morrison*, 120 S. Ct. at 1752 (noting that "whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question").

First, the mere fact that the aggregate social costs of an activity amount to a large dollar figure cannot, without more,

Court struck down the statute as an impermissible exercise of Congress's Commerce Clause authority.

In *United States v. Morrison*, 120 S. Ct. 1740 (2000), the Supreme Court elaborated upon the *Lopez* Court's category-three analysis in its review of the constitutionality of 42 U.S.C. § 13981, the Violence Against Women Act of 1994's civil remedy provision. Section 13981 provided a federal civil remedy for the victims of a "crime[] of violence motivated by gender." 42 U.S.C. § 13981(b) (1994). The *Morrison* Court first noted that "a fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case." *Morrison*, 120 S. Ct. at 1750. The Court then stated that "*Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor." *Id.* In striking down the statute, the Court noted that, similar to possession of a gun within 1,000 feet of a school zone, "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." *Id.* at 1751. Although the Court ostensibly eschewed the creation of a bright-line rule, *id.*, the Court's holding implied that for a statute which regulates intrastate activity to be upheld under category three, it must be "economic" in nature.[6]

To the extent that Faasse relies on *Lopez* and *Morrison* as support for his argument, he reveals a serious misunderstanding of these precedents. Undoubtedly, *Lopez*

---

[6]We do not believe, nor does *Morrison* hold, that all activity regulated by the Commerce Clause must be economic in nature; *Morrison* spoke only to Congressional regulation of exclusively *intra*state activities. Pursuant to its category one and two power, Congress may, for example, regulate the instrumentalities of commerce, such as automobiles or planes; Congress may regulate things in commerce that are non-commercial, such as lottery tickets; and Congress may regulate the channels of interstate commerce by, e.g., prohibiting racial discrimination and thereby increasing the flow of traffic through interstate channels.

and *Morrison* provide lower courts with significant guidance in their review of federal statutes regulating exclusively intrastate activity. *Cf. United States v. Robertson*, 514 U.S. 669, 671 (1995) (explaining that the category three "substantially affects" test need only be applied to intrastate commercial activity that has interstate effects). Neither *Lopez* nor *Morrison*, however, speaks in much detail to the first or second categories of activity that Congress may validly regulate under its Commerce Clause power. At oral argument, counsel for Faasse stated that *Morrison* was "aspirational" in nature and that its reasoning should be extended to the other categories of regulation. It is not our practice to decide cases based on a hunch that a decision by the Supreme Court is aspirational. We do know that the instant case indisputably involves the regulation of exclusively interstate transactions and that, as such, it does not implicate the Supreme Court's preeminent concern in *Lopez* and *Morrison*, namely that Congress's Commerce Clause power, taken too far, will erase the distinction "between what is truly national and what is truly local." *Morrison*, 120 S. Ct. at 1754. The CSRA is, in fine, no different from myriad other Acts of Congress that the Supreme Court has routinely upheld.

**B. "Thing" in Commerce**

As the Supreme Court has repeatedly made clear, Congress's power to regulate things in interstate commerce is plenary.[7]    *See Gibbons*, 22 U.S. (9 Wheat.) at 193, 196

---

[7] Out of concern that other litigants will rely upon it, we must to put to rest the dissent's reliance on the notion that interstate commerce requires "reciprocity," defined as "the mutual exchange of value motivated by economic self-interest," *post* p. 31, and that, because payment of a debt is not reciprocal, it is not a proper subject for Congress's Commerce Clause power. We know of *no* court that has imposed such a restrictive notion of commerce upon the Constitution. *Cf. Bailey*, 115 F.3d at 1228 n.7 (rejecting dissent's attempt to define commerce as "bilateral commercial transaction[]" and noting that such definition would require overruling numerous Supreme Court precedents) (citing *Hoke v. United States*, 227 U.S. 308, 320-23 (1913) (holding that

interstate commerce, which Congress has authority to prevent. *See, e.g.*, *United States v. Mussari*, 95 F.3d 787, 790 (9th Cir. 1996). I agree that Congress has power to remove impediments to interstate commerce. Thus, Congress may prohibit racial discrimination that obstructs the flow of interstate commerce, *see Heart of Atlanta Motel v. United States*, 379 U.S. 241, 253 (1964) (upholding the Civil Rights Act of 1964), prohibit violent actions that interfere with interstate commerce, *see United States v. Green*, 350 U.S. 415, 420 (1956) (upholding the Hobbs Act), and prohibit restraints of trade that obstruct interstate commerce, *see Standard Oil Co. v. United States*, 221 U.S. 1, 68 (1911) (upholding the Sherman Act). But this line of cases deals with active obstruction of the flow of interstate commerce; it does not stand for the more radical proposition that Congress is empowered to regulate the passive failure of individuals to engage in interstate commerce. *See Bailey*, 115 F.3d at 1239 n.15 (Smith, J., dissenting). More importantly, the obstruction argument conflates the *Lopez* categories. A prohibition on obstruction of commerce does not regulate "a thing" in commerce, nor does obstruction constitute a "use" of the channels of interstate commerce under the common meaning of "use". *Id.* Rather, Congress has authority to prohibit activities that interfere with commerce because those activities, taken in the aggregate, substantially affect commerce. The CSRA must therefore stand or fall, like the Gun Free School Zones Act, as a regulation under *Lopez*'s final category.

Most significantly, by effectively predicating jurisdiction on mere diversity of residency, the Act "regulates every interstate obligation, without exception." *Bailey*, 115 F.3d at 1238 (Smith, J., dissenting). But, as I have already shown, child support obligations are not commercial in character. In the absence of a mechanism that would link particular support obligations to some sort of economic enterprise, sustaining the constitutionality of the CSRA on the basis of this purported jurisdictional nexus requires the excising of the element of "commerce" from the "Commerce Clause." *See id.*

know of no case that holds that Congress has plenary authority to regulate a debt merely because the obligor and obligee reside in different states. This theory relies upon such pre-*Lopez* cases as *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282 (1921), and *Allenberg Cotton Co. v. Pittman*, 419 U.S. 20 (1974). In these cases, the parties executed contracts for the sale of goods that were to be performed within the territorial limits of a particular state, but which contemplated that the goods would enter the flow of interstate commerce. When these contracts were breached, the defendants asserted as a defense state laws prescribing conditions on which foreign corporations might do business in the state in which the contract was to be performed. The Supreme Court held that these business qualification laws, as applied, violated the Dormant Commerce Clause, saying "we think the transaction was in interstate commerce." *Dahnke-Walker*, 257 U.S. at 292. Tempting though it may be to apply this snippet in an analysis under *Lopez*'s second category, the Supreme Court itself has acknowledged that the clear import of *Dahnke-Walker* and *Allenberg Cotton* is that a state has no power "to prevent an engagement in interstate commerce within her limits, except by her leave." *Sonneborn Bros. v. Cureton*, 262 U.S. 506, 514 (1923). These cases support the traditional view that the federal power to regulate commerce prevents states from impeding the flow of goods and services across state lines, and in no way suggest that the federal legislature has regulatory jurisdiction with respect to the conduct of contracting parties on the basis of mere diversity of residency. *See United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 545 (1944) (emphasizing that legal formulae devised to assess state power cannot "uncritically be accepted as trustworthy guides to determine Congressional power under the Commerce Clause").

Even if they did so suggest, still another obstacle stands in the way of the hypothesis that the CSRA regulates a "thing in interstate commerce." Simply put, defendants in CSRA cases do not put something into the flow of interstate commerce; rather, they are being prosecuted for failing to do so. It has been argued that this failure amounts to an "obstruction" of

(explaining that the Commerce Clause "comprehend[s] every species of commercial intercourse" among the several states and that Congress's Commerce Clause power "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution"). Among the reasons the nation's Founders imbued the national legislature with an explicit grant of power in Article I, § 8, cl. 3 was to ensure that the Congress could regulate commerce that extended beyond an individual state's borders. *See Camps Newfound/Owatonna, Inc., v. Town of*

---

it is interstate commerce to transport a woman from one state to another in a common carrier); *United States v. Simpson*, 252 U.S. 465, 467 (1920) (holding that it is interstate commerce to carry across a state line in a private automobile five quarts of whiskey intended for personal consumption); and *Pensacola Tel. Co. v Western Union Tel. Co.*, 96 U.S. (6 Otto) 1, 11 (1877) (holding that it is interstate commerce to transmit information over interstate telegraph lines)). Indeed, the dissent in our case can only point to a dissent in the Fifth Circuit's *Bailey* decision to support its novel proposition, and even that dissent limited its requirement of reciprocity to "things" in commerce, *see Bailey*, 155 F.3d at 1235-36 & n.7 (Smith, J., dissenting), whereas the dissent in our case would apply its narrow understanding of commerce to every conceivable category. In addition to overruling various Supreme Court precedents, the dissent's definition of commerce would render unconstitutional innumerable federal statutes. For example, all federal statutes that criminalize the possession of drugs or weapons which have traveled interstate would, on the dissent's view of commerce, have to be struck down because there is no reciprocity in possession, nor does possession of a contraband substance invoke "the wealth-creating aspect of markets." *Post* at p. 31. The same can be said of federal regulations of the air and water, of the highways and the nation's airspace, and myriad safety regulations, none of which involve reciprocity. The most likely genesis for the dissent's reasoning is that line of cases, such as *Hammer v. Dagenhart*, 247 U.S. 251, 272-74 (1918), in which the Supreme Court relied on a narrow construction of the word "commerce" and attempted to craft rigid distinctions between "manufacture," "production," and "mining," thought to be the province of the states, and actual interstate "commerce." *See Wickard v. Filburn*, 317 U.S. 111, 119-24 (1942) (discussing development of Commerce Clause jurisprudence). The *Dagenhart* line of cases was, of course, subsequently overruled and currently represents a completely discredited understanding of the Commerce Clause. In any event, we have no doubt that the Supreme Court's contemporary understanding of "commerce" includes an interstate money payment.

*Harrison*, 520 U.S. 564, 571 (1997) (explaining, with respect to a dormant Commerce Clause challenge to a state statute, that "[i]f there was any one object riding over every other in the adoption of the constitution, it was to keep the commercial intercourse among the States free from all invidious and partial restraints") (quoting *Gibbons*, 22 U.S. (9 Wheat.) at 231); *cf. Lopez*, 514 U.S. at 574 (Kennedy, J., concurring) ("Congress can regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy."). Indeed, the Founders recognized that commerce that crossed state lines could exceed the states' capacity to regulate such commerce uniformly or to enforce the states' own laws. In *United States v. South-Eastern Underwriters Ass'n*, the Supreme Court observed:

> The power confined to Congress by the Commerce Clause is declared in The Federalist to be for the purpose of securing the 'maintenance of harmony and proper intercourse among the States.'. . . It is the power to legislate concerning transactions which, reaching across state boundaries, affect the people of more states than one; — to govern affairs which the individual states, with their limited territorial jurisdictions, are not fully capable of governing.

*United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 551-52 (1944) (footnotes omitted).

In exercising its positive Commerce Clause power, "Congress has often passed legislation to help the States solve problems that defy local solution." *Sage*, 92 F.3d at 105. Thus, in *Perez v. United States*, 402 U.S. 146, 150 (1971), the Supreme Court noted that legislative history for the Consumer Credit Protection Act, 18 U.S.C. § 891 *et seq.*, which makes intrastate loan sharking activities a federal crime, reflected Congress's concern that loan sharking, a significant component of organized crime, was a national affliction and required a federal antidote because "[t]he problem simply [could not] be solved by the States alone." Earlier, in *United*

interstate highway system; . . . interstate telephone and telegraph lines; air traffic routes; television and radio broadcast frequencies." *Gibbs v. Babbitt*, 214 F.3d 483, 490-91 (4th Cir. 2000) (alteration in original) (internal quotation marks omitted). Congress has broad authority with respect to these channels; not only may the Legislature regulate them directly, it may act to keep them "free from immoral and injurious uses." *Caminetti v. United States*, 242 U.S. 470, 491 (1917). But Congress does not act pursuant to this authority when it regulates an activity that merely "implicates" or "invokes" the use of the channels of interstate commerce. *Cf. Bailey*, 115 F.3d at 1227. Thus, this court held in *United States v. Abdullah* that the ban on trafficking in contraband cigarettes found at 18 U.S.C. §§ 2341-46 does not fall within the first *Lopez* category because the *purpose* of the ban is not "to keep open the very avenues by which interstate commerce is transacted." *United States v. Abdullah*, 162 F.3d 897, 901 (6th Cir. 1998). Indeed, to hold otherwise would be to collapse the first and second *Lopez* categories; any regulation of a thing in interstate commerce would necessarily be a regulation of the use of the channels of interstate commerce. The failure to place a payment in the channels of interstate commerce does not corrupt those channels, put them to immoral uses, or in any way threaten to close or impede them. Assuming that the Supreme Court did not idly draw the distinctions that it did, I cannot agree that the CSRA regulates the channels of interstate commerce merely by criminalizing the failure to make support payments which, if made, would normally enter the flow of interstate commerce.

Similarly unpersuasive is the argument that the CSRA regulates a thing in interstate commerce. This contention relies on an analogy between child support obligations and interstate debts, and on the further supposition that Congress may compel payment of debts through its power to prevent obstruction of interstate commerce. Accepting for the moment the rickety analogy between support obligations and debts, (although, as noted above, I do not believe support obligations in fact have any commercial character at all) I

F.3d 28, 30-31 (3d Cir. 1997). Any of these theories,[2] however, would permit the creation of a federal law of ordinary private debt, whenever one party moved out of state after the debt was created. For the reasons set forth below, these arguments are unpersuasive.

I admit to some confusion with respect to the notion that the CSRA regulates the use of the channels of interstate commerce. The term "channel of interstate commerce" refers to, *inter alia*, "navigable rivers, lakes, and canals of the United States; the interstate railroad track system; the

[2]The majority fails to identify clearly which category of *Lopez* authorizes its holding, and instead cobbles together pieces from each to find congressional regulatory authority. But the categories of permissible regulation of commerce set forth in *Lopez* are discrete and limited, and do not permit courts to "mix and match" attributes of the various categories to extend congressional power.

The majority begins with the doubtful premise that a debt owed to one in another state is a "thing" in interstate commerce, regardless of whether payment is demanded or attempted. From there, the majority reasons that if the debt were to be paid, the payment would travel in the channels of interstate commerce, whose regulation falls within the category of keeping the channels of commerce open and free from impediments. The majority then concludes that because the Constitution authorizes Congress to keep commercial channels free from impediments, and because the payment of an interstate debt is a "thing" in interstate commerce, Congress may impose criminal penalties for failure to place such a payment into the channels of interstate commerce. This "if we had some ham we could have a ham sandwich if we had some bread" reasoning is unfortunate.

The distinct categories of *Lopez*, and the majority's fallacious reasoning are perhaps better illustrated by using as an example a hypothetical river barge carrying goods interstate. Using its power to keep the channels of interstate commerce free from impediments, Congress could legitimately prevent the building of dams or toll locks on the river. Likewise, Congress could properly regulate the barge and its cargo as things in interstate commerce. Or, Congress might regulate wholly intrastate aspects of production of goods carried on the barge if that production substantially affected the commerce of the nation. But today's majority opinion would allow Congress to criminalize the failure to place cargo on the barge under the theory that such failure might somehow stem the flow of the river, because the lack of the goods would substantially affect certain individuals residing downstream.

*States v. Sheridan*, 329 U.S. 379, 384 (1946), the Supreme Court explained that Congress passed the National Stolen Property Act, 18 U.S.C. §§ 413-19, to assist "the states in detecting and punishing criminals whose offenses are complete under state law, but who utilize the channels of interstate commerce to make a successful get away and thus make the state's detecting and punitive processes impotent."

When Congress enacted the CSRA in 1992, legislative history reveals that it did so in response to a dilemma it considered national in scope and whose resolution had defied the authority of the individual states. The House Judiciary Committee, which authored a report accompanying the bill that became 18 U.S.C. § 228, stated that the Committee had found that interstate collection of child support was "the most difficult to enforce" and accounted for an "unacceptably high" deficit in child support payments. H.R. REP. NO. 102-771, at 5-6 (1992). According to the report, approximately one-third of child support cases involve children whose non-custodial parent lives in a state different from the child and whose custodial parent must therefore rely on interstate payments of child support. Among this group relying on interstate payment, fifty-seven percent of the custodial parents reported receiving child support payments "only occasionally, seldom or never." *Id.* at 5. After noting that "at least 42 states have made willful failure to pay child support a crime," the report concluded that "the ability of those states to enforce such laws outside their own boundaries is severely limited." *Id.* at 5-6. Indeed, the report found that even though most states had adopted the Uniform Reciprocal Enforcement of Support Act, which was designed to deal with the extradition of defendants who failed to pay interstate child support, "interstate extradition and enforcement in fact remains a tedious, cumbersome and slow method of collection." *Id.* at 6.

As this report makes plain, Congress's enactment of the CSRA was premised upon a paradigmatic use of its Commerce Clause power over "things" in commerce: to regulate national problems that confound state-by-state solution. As the Second Circuit noted:

All the Act does is enable the United States to help [the state] do what it could not do on its own, namely, enforce [the defendant's] obligation to send money from one State to another.   Congress was not impotent to overcome the obstacles inherent in our Federal system to the enforcement of that obligation.

*Sage*, 92 F.3d at 105.

Therefore, pursuant to its authority to regulate things in interstate commerce, be they commercial or not, we believe that Congress may properly prohibit a non-custodial spouse from refusing to pay court-ordered child support when the child lives in another state. The CSRA is explicitly premised upon the non-custodial parent's unfulfilled court-ordered obligation to make an interstate money payment to the custodial parent. Importantly, "[p]ayments stemming from a support obligation will usually travel in interstate commerce by mail, wire, or electronic transfer." *Black*, 125 F.3d at 460; *cf. United States v. Owens*, 159 F.3d 221, 226 (6th Cir. 1998) (upholding money laundering conviction under 18 U.S.C. § 1956 and finding statute valid exercise of Congress's Commerce Clause authority under category two because "use of federally insured banks and/or the transport of monies across state borders to facilitate the money laundering create a sufficient nexus to interstate commerce to allow application of § 1956"). The money payment, or its absence, which would travel through interstate commerce, is the "thing" which Congress may validly regulate.

It matters not, for purposes of the Constitution, whether the child support payment is a tangible thing. In *South-Eastern Underwriters Ass'n*, 322 U.S. at 546, in which the Supreme Court upheld Congress's authority to regulate interstate insurance contracts, the Court made clear that "Congress can regulate traffic though it consist of intangibles." The Court also noted that "transactions [may] be commerce though non-commercial; they may be commerce though illegal and sporadic, and though they do not utilize common carriers or concern the flow of anything more tangible than electrons and

The Court then explained that "consistent with the great weight of our case law . . . the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.* Having clarified that point, the Court concluded that several critical factors prevented § 922(q)(1)(A) from qualifying as a valid exercise of congressional authority under the third category. First, since § 922(q)(1)(A) did not regulate a commercial activity, the statute could not be upheld as regulating "activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* at 561. Further, the statute contained no "jurisdictional element which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce." *Id.* Finally, the statute was not supported by specific "congressional findings [that] would enable [the Court] to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye." *Id.* at 563.

The majority in the case before us today says that the CSRA falls within category I, and perhaps category II, of *Lopez*. Because payment of child support on behalf of an out-of-state child will normally require the use of channels of interstate commerce, the majority argues, the CSRA is constitutional under the first *Lopez* category. *See also United States v. Crawford*, 115 F.3d 1397, 1400 (8th Cir. 1997). The majority apparently also embraces the thesis that likens child support obligations to interstate debts or contracts, and asserts that Congress's authority to prevent obstruction of interstate commerce empowers it to criminalize nonpayment of such obligations. *See United States v. Bongiorno*, 106 F.3d 1027, 1032 (1st Cir. 1997); *United States v. Sage*, 92 F.3d 101, 105-06 (2d Cir. 1996). The majority also suggests that because the obligations covered by the CSRA, in the aggregate, total billions of dollars, the Act might pass muster under *Lopez* as a regulation of an intrastate activity that substantially affects interstate commerce. *See, e.g.*, *United States v. Parker*, 108

Kentucky Resolutions, 2d Resolved cl. (1798), *reprinted in* The Portable Thomas Jefferson 281, 282 (Merrill Peterson ed., 1979); *see also Patterson v. New York*, 432 U.S. 197, 201 (1977) (stating that "preventing and dealing with crime is much more the business of the States than it is of the Federal Government"). In a like vein, the courts have consistently recognized that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not the laws of the United States." *Ex parte Burrus*, 136 U.S. 586, 593-94 (1890); *see also Sosna v. Iowa*, 419 U.S. 393, 404 (1975) (stating that the "regulation of domestic relations . . . has long been regarded as a virtually exclusive province of the States"); *cf. Ankenbrandt v. Richards*, 504 U.S. 689 (1992) (recognizing a domestic relations exception to the diversity jurisdiction of federal courts in view of long-held understandings and sound policy considerations).

In *Lopez*, the Supreme Court addressed the reach of Congress's commerce power. The Court struck down the Gun Free School Zones Act, 18 U.S.C. § 922(q)(1)(A) (1994), which prohibited " 'any individual knowingly to possess a firearm at a place [he] knows . . . is a school zone,' " as an unconstitutional exercise of Congress's power under the Commerce Clause. *Lopez*, 514 U.S. at 551. That power, the Court observed, extends to only three types of activity: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) those activities having a substantial relation to interstate commerce, namely, those activities that substantially affect interstate commerce. *Id.* at 558-59. Since § 922(q)(1)(A) did not involve channels or instrumentalities of interstate commerce, the Court reasoned that the statute would be constitutional only if it qualified under the third category, as a statute that regulated an activity which substantially affected interstate commerce. *Id.* at 559.

In considering that question, the Court recognized that its case law had not always been clear as to whether an activity must "affect" or "substantially affect" interstate commerce.

information." *Id.* at 549-550; *see also Reno v. Condon*, 528 U.S. 141, 148 (2000) (upholding Driver's Privacy Protection Act, which forbids the states from selling or releasing drivers' personal, identifying information, as valid regulation of "thing" in interstate commerce).

Moreover, it is immaterial that the CSRA regulates a defendant's failure to put a thing in commerce.[8] It is true that many federal statutes prohibit, rather than seek to compel, goods or services from passing through interstate commerce. *See, e.g.*, *United States v. Darby*, 312 U.S. 100, 115 (1941) (upholding criminal provision of Fair Labor Standards Act proscribing interstate shipment of goods produced by employees whose wages and hours of employment did not conform to the Act). As the Fifth Circuit noted, however, "[t]he Supreme Court has often held, in several contexts, that the defendant's nonuse of interstate channels alone does not shield him from federal purview under the Commerce Clause." *Bailey*, 115 F.3d at 1229-30; s*ee also Sage*, 92 F.3d at 105-06 (rejecting argument that failure to send money does not invoke Commerce Clause power because "[i]f Congress can take measures under the Commerce Clause to foster potential interstate commerce, it surely has power to prevent the frustration of an obligation to engage in commerce"). Thus, in *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 257-58 (1964), the Supreme Court upheld Title II of the Civil Rights Act of 1964, which provides for equal access to places of public accommodation without regard to race, explaining that the Heart of Atlanta Motel's refusal to accommodate blacks was an impermissible "obstruction to interstate commerce" because it deterred blacks from engaging in interstate travel; in *United States v. Green*, 350 U.S. 415, 420 (1956), the Supreme Court upheld the Hobbs Act, 18 U.S.C. § 1951, which makes illegal robbery or extortion that "in any way or degree obstructs, delays, or

---

[8]Indeed, in *Lopez*, the Supreme Court explicitly noted that theft from interstate shipments, in violation of 18 U.S.C. § 659, was an example of a regulation legitimately passed by Congress pursuant to its power to protect things in interstate commerce. *See Lopez*, 514 U.S. at 558.

affects commerce" and thus removes obstacles to interstate commerce; and in *Standard Oil Co. v. United States*, 221 U.S. 1, 74 (1911), the Supreme Court upheld the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, which makes illegal "every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States" and thereby furthers interstate commerce that otherwise would have been stifled. If Congress may validly restrict one industry's restraint on trade or prevent intrastate extortion because it obstructs the flow of interstate commerce, certainly Congress may regulate Faasse's failure to send payments from California to Michigan as a similar obstruction of interstate commerce.[9]

The dissent's contention that Faasse passively failed to engage in commerce, instead of actively obstructed commerce, and that these precedents therefore do not apply to him, is not well taken. Faasse's failure to act was not "passive" in this case, it was willful, as he was under a state court order to pay child support which he deliberately disobeyed. Indeed, we note that the scienter element in the CSRA requires willfulness: the statute may only be invoked if a defendant "willfully fails to pay a past due support obligation with respect to a child who resides in another State." 18 U.S.C. § 228(a) (1994). When Faasse pleaded guilty, he acknowledged his guilt as to each and every element of the offense. Thus, by virtue of his guilty plea, Faasse conceded that his failure to pay child support was willful. We conclude that the distinction between "active obstruction" and "passive failure" is, in this case, illusory and we reject any attempt to hide behind it.

We are also nonplused by the assertion that, in some hypothetical situations, a debtor parent and the custodial parent may reside in one state while the minor child resides in

---

[9] We can conceive of no principled distinction between the parent who fails to send any child support through commerce and the parent who sends only a fraction of the amount owed; on Faasse's understanding of the Commerce Clause, the former would not be subject to federal sanction but the latter would be. This result is clearly untenable.

that they are properly the subject of the commerce power.[1] And the cases cited by the majority do not deal with Congress's authority to regulate "things" in interstate commerce. Neither do these cases hold that commerce need not involve an element of reciprocity. Rather, these cases deal with regulating the channels of interstate commerce by keeping them open and free from immoral uses.

The CSRA does not regulate within any of the categories permitted by *Lopez*, namely, the channels of interstate commerce, things that travel in these channels, or intrastate activity that substantially affects commerce. Rather, the Act regulates, through the imposition of criminal sanctions, obligations owed by one family member to another, using diversity of residence as a jurisdictional "hook." This is particularly troubling because the states possess primary authority for defining and enforcing both the criminal law and the law of domestic relations. As Thomas Jefferson wrote:

> [T]he Constitution of the United States, having delegated to Congress the power to punish treason, counterfeiting the securities and current coin of the United States, piracies, and felonies committed on the high seas, and offenses against the law of nations, and no other crimes whatsoever; and it being true as a general principle, and one of the amendments to the Constitution having also declared, that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people," therefore . . . all their other acts which assume to create, define, or punish crimes, other than those so enumerated in the Constitution, [] are altogether void, and of no force; and that the power to create, define, and punish such other crimes is reserved, and, of right appertains solely and exclusively to the respective States, each within its own territory.

---

[1] A court order to pay child support reflects a parent's legal and moral debt to the child, but the child has no reciprocal obligation to the parent. There is simply no commerce involved in this kind of obligation.

794, 803 (1976) (noting "the premise, well established by the history of the Commerce Clause, that this nation is a common market").

The failure to obey a state court order, of course, lacks this essential feature of reciprocity. This is so even where the order mandates a transfer of wealth, as do child support orders. "[P]ayment of child support is not conditioned on the performance of a reciprocal duty by the obligee, nor does it benefit the obligor." *Bailey*, 115 F.3d at 1236 (Smith, J., dissenting). Due to this unilateral, redistributive character, support obligations can influence the "national common market" only at the margins, if at all. Indeed, the right to support payments is not freely alienable and, in some instances, the payments must be made to the state rather than directly to the ultimate beneficiary, further depriving these payments of the potential to affect the market. *See, e.g.*, Mich. Comp. Laws Ann. § 552.452 (West 2001) (providing for payment of support to the office of the Michigan friend of the court). Because of their nature, court-ordered wealth transfers to or from Michigan residents are not per se a fit object of the federal commerce power.

The majority seeks to "put to rest" the notion that interstate commerce requires reciprocity, attributing to this dissent the premise that because payment of a debt is not reciprocal, it is not subject to Congress's commerce power. The majority next cites *United States v. Simpson*, 252 U.S. 465 (1920), *Hoke v. United States*, 227 U.S. 308 (1913), and *Pensacola Tel. Co. v. Western Union Tel. Co.*, 96 U.S. (6 Otto.) (1877), for the proposition that the mere transport of people or information across state lines gives Congress authority to regulate them. The majority then reasons that a debt, or the support order enforcing it, is a "thing" in interstate commerce and therefore subject to congressional regulation. But although debts are typically reciprocal in the sense that payment is being sought for something of value given earlier, it does not follow that all debts are commercial in nature, such

another, thereby undermining the rationale for federal regulation. Although such a scenario is unlikely, we note that the debtor parent's payment must still travel through interstate commerce, thereby making use of the channels of commerce, to reach the child. Moreover, we do not strike down a statute facially because there are hypothetical situations in which the Act's interstate commerce connection may conceivably be tenuous.[10] *See United States v. Valenzeno*, 123 F.3d 365, 368 (6th Cir. 1997).

Finally, we wish to make clear that this statute does not, as Faasse and the dissent would have us believe, regulate a traditional area of family law best left to the states. In both *Lopez* and *Morrison*, the Supreme Court noted that should the "substantial effects" and aggregation principles for *intra*state activity be extended too far, it would provide Congress with authority to regulate "family law and other areas of traditional state regulation since the aggregate effect of marriage, divorce, and childrearing on the national economy is undoubtedly significant." *Morrison*, 120 S. Ct. at 1753. First, the CSRA does not rely exclusively upon either the "substantial effects" or aggregation principle for its constitutionality; as noted above, it regulates *inter*-, not *intra*-state economic activity. Moreover, the statute does not purport to regulate the non-economic activities associated with marriage, divorce, or childrearing under the guise that, in the aggregate, such activities substantially affect interstate commerce. As a regulation of out-of-state debtors who owe court-ordered payments, the CSRA deals exclusively with interstate economic transactions. *Cf. United States v. Napier*, 233 F.3d 394, 402 (6th Cir. 2000) (upholding 18 U.S.C.

---

[10]We note that Faasse brings an as-applied constitutional challenge to the CSRA. Thus, he claims that application of the CSRA to his particular circumstances is unconstitutional. The appropriate remedy for his as-applied challenge would be to invalidate the statute as to Faasse. Facial invalidation of a statute, in contrast, is reserved only for when there are no set of circumstances in which the statute's application would be constitutional. *See Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton, Ohio*, 240 F.3d 553, 562 (6th Cir. 2001). Clearly, Faasse's hypothetical does not call for facial invalidation of the CSRA.

§ 922(g)(8), criminalizing possession of a weapon that has traveled interstate while defendant is subject to domestic violence order, against claim that statute regulates traditional area of family law, because statute's jurisdictional element ensures it was enacted pursuant to Congress's power to regulate interstate commerce in firearms). Therefore, we are confident that the statute does not implicate the Court's concern that Congress may attempt to create federal family law under the pretext of its Commerce Clause power.

Second, the statute does not supplant traditional state statutory enforcement mechanisms. In this case, Michigan remains the exclusive regulator and enforcer of all unpaid child support obligations in its state unless the non-custodial parent (or the child) both lives out of state *and* the parent fails to make payments. In such a situation, Congress made express findings that collection of past-due debts had grown beyond the enforcement capacities of the states. The CSRA does not supplant or preempt state law because it does not implicate the states' ability or authority to order child support payments, nor does it compel states to enforce such orders.[11] Instead, the CSRA merely reinforces state laws which the states were unable to enforce themselves.[12] This is a most

---

[11]Indeed, federal courts reviewing prosecutions under the CSRA have held that they cannot disturb the underlying state court child support order. *See United States v. Brand*, 163 F.3d 1268, 1275 (11th Cir. 1998) (holding that defendant's attempt collaterally to attack the "state court order is not cognizable. The language of the CSRA merely requires the *existence* of a 'past due support obligation.' The Act's terms do not require that such an obligation be 'valid'") (footnote omitted).

[12]Moreover, we note that, according to Department of Justice guidelines, a United States Attorney's Office may not initiate a federal prosecution under the CSRA unless "all reasonably available [state] remedies have been exhausted." Ronald S. Kornreich, Note, *The Constitutionality of Punishing Deadbeat Parents: The Child Support Recovery Act of 1992 After* United States v. Lopez, 64 FORDHAM L. REV. 1089, 1098 (1995) (quoting Department of Justice Prosecutive Guidelines and Procedures for the Child Support Recovery Act of 1992, at 4 (1993)). Prior to federal prosecution, other civil remedies must also be attempted: the U.S. Attorney must send a letter to the potential defendant "advising

The Federalist, No. 22, at 144 (Alexander Hamilton) (Clinton Rossiten ed., 1961).

Hamilton also highlighted the need for a federal commerce power to check the mercantilist and imperialist aims of European maritime powers, writing "[t]hose of them which have colonies in America look forward to what this country is capable of becoming with painful solicitude. They foresee the dangers that may threaten their American dominions from the neighborhood of States . . . ." The Federalist, No. 11, at 85 (Alexander Hamilton) (Clinton Rossiten ed., 1961).

The most widely accepted general description of commerce, and the one cited by the majority, is given in *Gibbons v. Ogden*: "Commerce, undoubtedly, is traffic, but it is something more—it is intercourse. It describes the commercial intercourse between nations, and parts of nations in all its branches . . . ." *Gibbons*, 22 U.S. (9 Wheat.) 1, 189-90 (1824). However, as Judge Jerry Smith has pointed out, "intercourse" has as its distinguishing feature a notion of reciprocity. *United States v. Bailey*, 115 F.3d 1222, 1236 (5th Cir. 1997) (Smith, J., dissenting); *see also* Webster's New World Dictionary of the American Language 733, 734 (2d ed. 1972) (defining intercourse as "communication or dealings between or among people, countries, etc.: interchange of products, services, ideas, feelings, etc.," and interchange as "to give and take mutually; exchange . . . to put (each of two things) in the other's place . . . ."). This element of reciprocity—the mutual exchange of value motivated by economic self-interest—defines the marketplace which fosters social wealth. *See* Michael Klausner, *Corporations, Corporate Law, and Networks of Contracts,* 81 Va. L. Rev 757, 771 (1995) (noting the basic precept of welfare economics that competitive market forces optimize social wealth). And it is the wealth-creating aspect of markets that justifies a national commerce power in our federal system; as the Supreme Court reminds us, the "overriding requirement" of the Commerce Clause is a national common market. *Hunt v. Washington State Adver. Comm'n*, 432 U.S. 333, 350 (1977); *see also Hughes v. Alexandria Scrap Corp.*, 426 U.S.

abortive, but engendered rival, conflicting and angry regulations." 3 The Records of the Federal Convention 547 (Max Farrand ed., 1966).

This power to prevent states from establishing parochial barriers to national trade, and the resulting injuries to the national economic health, was "so universally assumed to be necessary, no other state power was so readily relinquished." *H.P. Hood & Sons, Inc.*, 336 U.S. at 534. Justice Jackson noted this need for uniformity as the Framer's primary objective and recognized their intent to limit the commerce power to the protection of the free flow of commerce; commenting, "[t]here was no desire to authorize federal interference with social conditions or legal institutions of the states." *Id.* In fact, the arguments made in favor of the Constitution's ratification generally, and the Commerce Clause specifically, highlighted the need for a federal commerce power in order to navigate successfully the rough waters of the developing Transatlantic economy. So vital was this American common market to the former colonies' participation in international trade, that constitutional supporters exhorted:

> [T]here is no object, either as it respects the interests of trade or finance, that more strongly demands a federal superintendence. The want of [a federal commerce power] has already operated as a bar to the formation of beneficial treaties with foreign powers, and has given occasions of dissatisfaction between the States. No nation acquainted with the nature of our political association would be unwise enough to enter into stipulations with the United States, by which they conceded privileges of any importance to them, while they were apprised that the engagements on the part of the Union might at any moment be violated by its members, and while they found from experience that they might enjoy every advantage they desired in our markets, without granting us any return but such as their momentary convenience might suggest.

appropriate use of federal power.[13] *See South-Eastern Underwriters Ass'n*, 322 U.S. at 552 (noting that Commerce Clause power "is a positive power . . . to govern affairs which the individual states, with their limited territorial jurisdictions, are not fully capable of governing").

An interstate court-ordered child support payment clearly is a "thing" in interstate commerce. *See Bailey*, 115 F.3d at 1229 ("The CSRA . . . seeks to prevent the frustration of an interstate commercial transaction that otherwise would have occurred absent the defendant's dereliction. It is thus subject to federal control [under category two] for that reason."); *Crawford*, 115 F.3d at 1400 (finding that payments of child

---

him of the apparent CSRA violation and requesting payment of the support obligation within a specified period. If payment is not made, the matter is referred to the Federal Bureau of Investigation. Prior to filing charges, a second letter is sent to the would-be defendant, advising him that charges will be filed against him unless he makes payment within a specified period of time. If payment is still not forthcoming and there is no adequate explanation for nonpayment, the U.S. Attorney will charge the parent with violating the CSRA." *Id.* (footnotes omitted).

[13]The dissent argues that, because the Michigan legislature has not chosen to criminalize the failure to pay child support, the United States Congress is forbidden from criminalizing such non-payment when the obligation becomes due and one parent has left the state. A state's failure to criminalize an intra-state problem has no bearing on Congress's authority to determine that once a problem becomes interstate in nature, as in the case at hand, it deserves criminal punishment, most likely because of its pervasiveness and susceptibility to escaping state law enforcement. More importantly, once we have decided that Congress acts legitimately pursuant to its Commerce Clause power, whether or not Congress criminalizes an act which the states have not similarly regulated is immaterial for constitutional purposes. *Cf. Bailey*, 155 F.3d at 1232 (noting that "principles of federalism and comity are not compromised when the [federally] regulated activity falls inside constitutionally-defined perimeters of congressional control"). Finally, we do not believe that federal enforcement of unpaid child support orders, which were entered by a state court pursuant to state law and therefore presumably in accord with the state legislature's determination that child support should be paid, does "considerable damage to Michigan's system for regulating child support," *post* at p. 43, particularly in view of the fact that a federal court cannot revise the underlying state court order.

support on behalf of an out-of-state child, or the debts resulting from nonpayment, are things in interstate commerce); *Bongiorno*, 106 F.3d at 1032 (holding that "[b]ecause child support orders that require a parent in one state to make payments to a person in another state are functionally equivalent to interstate contracts, such obligations are 'things' in interstate commerce") (internal citation omitted); *Mussari*, 95 F.3d at 790 ("The obligation of a parent in one state to provide support for a child in a different state is an obligation to be met by a payment that will normally move in interstate commerce — by mail, by wire, or by the electronic transfer of funds. That obligation is, therefore, a thing in interstate commerce and falls within the power of Congress to regulate."). Therefore, the Congress may freely regulate the interstate court-ordered child support payment, provided we find that the statute's means are rationally related to its ends, which we do. Thus, we conclude that the CSRA represents an appropriate exercise of Congress's Commerce Clause power.

## C.  Other Categories of Regulation

Although we have determined that the CSRA validly regulates a thing in commerce within *Lopez*'s category two, we also believe that the statute is a constitutional regulation of the channels of interstate commerce.[14] *Accord Crawford*,

---

[14] We see no logical flaw in holding that the CSRA is a valid regulation under multiple *Lopez* categories. *Lopez* does not evince the Supreme Court's intent to hold courts to rigid classifications between the activities that Congress may properly regulate; indeed, the Supreme Court noted that its three categories of activity were "broad" and did not state that they were exclusive. *Lopez*, 514 U.S. at 558. An early Supreme Court case, *Champion v. Ames*, 188 U.S. 321, 354 (1903), upholding a Congressional Act regulating the traffic of lottery tickets in interstate commerce, is, according to a leading constitutional scholar, a paradigmatic example of a regulation of both a "thing" in interstate commerce and the channels of interstate commerce. *See* LAWRENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 829 (3d ed. 2000). The lottery ticket was the "thing," and the Act in question regulated the channels of commerce by prohibiting the movement of a good considered injurious to the public welfare. Indeed, in *United States v. Beuckelaere*, 91 F.3d 781,

---

---

### DISSENT

---

ALICE M. BATCHELDER, dissenting. Because my view of the Commerce Clause fundamentally differs from that of the majority, I respectfully dissent. In *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 120 S. Ct. 1740 (2000), the Supreme Court made clear that some matters are simply outside of the scope of congressional regulation under the Commerce Clause. I think that criminalizing the failure to pay child support pursuant to a state court order is one of those matters. In the original panel decision, we noted that the Framers of our Constitution drafted the Interstate Commerce Clause, not the Interstate Clause. The majority's construction renders the commerce component meaningless. Such a reading violates the intent of the Framers, and transforms the Commerce Clause – a measure drafted to prevent state interference in the economic affairs of the nation – into a virtually limitless federal police power, contrary to the Supreme Court's recent holdings in *Lopez* and *Morrison*.

In determining the scope of congressional power under the Commerce Clause, a brief review of the historical roots of this power is instructive. As the Supreme Court has noted, "The sole purpose for which Virginia initiated the movement which ultimately produced the Constitution was 'to take into consideration the trade of the United States; to examine the relative situations and trade of the said states; to consider how far a uniform system in their commercial regulation may be necessary to their common interest and their permanent harmony.' Documents, Formation of the Union, 12 H. Docs., 69th Cong., 1st Sess., p. 38." *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 533 (1949). James Madison, chief architect of our federal system, stated that the Union required a power to regulate commercial activity, because "want of a general power over Commerce led to an exercise of this power separately, by the States, which not only proved

Because the district court did not fail to consider any of the statutory factors and did not order an amount of restitution in excess of what is required by statute, we must conclude that the district court did not abuse its discretion by holding Faasse responsible for restitution of the full amount of unpaid child support. We also believe that the district court's order to pay the restitution in a lump sum is not an abuse of discretion. *See* 18 U.S.C. § 3664(f)(3)(A) (noting that a restitution order may direct the defendant to make single, lump-sum payment or partial payments at specified intervals). Although the probation officer advised that Faasse could pay restitution "at a rate deemed reasonable by the Court," J.A. at 124, the magistrate judge explicitly declined to devise a payment plan for the restitution order. J.A. at 108. He based his decision on his belief that Faasse "has had means and methods to pay this money all along, he just will not . . . ." *Id.* Because Faasse was evasive and recalcitrant in providing financial information to the court, and the burden was his to demonstrate his inability to pay, we cannot conclude that the magistrate judge's finding is an abuse of discretion.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED** in all respects.

115 F.3d at 1400 (finding CSRA valid regulation under category one because "payment of child support on behalf of an out-of-state child requires the use of channels of interstate commerce"); *Bailey*, 115 F.3d at 1227 (concluding that CSRA is valid regulation under category one because "the child support obligation — made interstate in nature as a direct consequence of the diversity requirement imposed upon the obligor and the obligee — can be satisfied normally by a payment that necessarily must move in interstate commerce").

In *Lopez*, the Court stated that there are two kinds of permissible regulation under the first category of activity: (1) "regulation of the use of the channels of interstate commerce;" and (2) "an attempt to prohibit the interstate transportation of a commodity through the channels of commerce." *Lopez*, 514 U.S. at 559. As the Court's references to *United States v. Darby*, 312 U.S. at 114 (upholding criminal prosecution under the Fair Labor Standards Act for interstate shipment of lumber which was manufactured intrastate by employees whose wages and hours did not conform with Act) and *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. at 256 (upholding Title II of the Civil Rights Act of 1964 forbidding public accommodations from refusing to serve customers based on race and noting that "the authority of Congress to keep the channels of interstate

784-85 (6th Cir. 1996), we found 18 U.S.C. § 922(o), which criminalized the possession or transfer of a machinegun, constitutional because it regulated both a "thing" in interstate commerce and the channels of interstate commerce. This is not to say that a regulation of a "thing" in commerce necessarily implies a valid regulation of the channels of commerce. A regulation of a "thing" in commerce may be directed solely at that thing, such as a law proscribing theft from interstate shipments, *see Perez v. United States*, 402 U.S. 146, 150 (citing 18 U.S.C. § 659), but have nothing to do with keeping open the channels of commerce, or prohibiting injurious goods from flowing across state lines. Thus, we do not find anything improper with our conclusion that the CSRA validly regulates both the use of the channels of interstate commerce and a "thing" in interstate commerce, because the support obligation is, by definition, a "thing" and the CSRA promotes the flow of money through interstate channels.

commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question") illustrate, permissible category one regulation encompasses more than simple regulation of the nation's highways, railroads, or other literal "channels" of commerce. *Lopez*, 514 U.S. at 558. These cases teach that Congress has the power, under category one, to regulate or exclude certain categories of goods from flowing across state lines through the channels of commerce. Our case law is in harmony with the Supreme Court: in *United States v. Beuckelaere*, 91 F.3d at 784, we upheld, as a category one regulation, 18 U.S.C. § 922(o), a statute criminalizing the possession or transfer of a machinegun because the "illegal possession of a machinegun cannot occur without an illegal transfer, which given the national marketplace for machineguns, involves the channels of interstate commerce." We therefore conclude that, based upon its power to regulate the use of the channels of interstate commerce, the CSRA was validly enacted under *Lopez*'s category one.

Finally, we also believe that, although not necessary to our holding today, we could find the CSRA a valid regulation under *Lopez*'s category three. The statute regulates financial obligations which must move in interstate commerce, via mail, wire, or electronic transfer; it has an explicit jurisdictional nexus to interstate commerce — the child and non-custodial parent must reside in different states; and it is supported by Congressional findings explaining the effect on interstate commerce of the failure to make court-ordered child support payments. *Accord Parker*, 108 F.3d at 30; *Crawford*, 115 F.3d at 1400; *Hampshire*, 95 F.3d at 1004 (all upholding CSRA under *Lopez*'s category three). Congress clearly had a rational basis for enacting the CSRA under its category three Commerce Clause power. In sum, we believe that the CSRA is valid under each of the three *Lopez* categories.

## III.  ORDER OF RESTITUTION

Having rejected Faasse's constitutional challenge to the CSRA, we now turn to his challenge to the district court's

the ability to pay restitution . . . at a rate deemed reasonable by the Court. *After no less than five requests, the defendant has failed to return his Personal Financial Statement to this office.*

J.A. at 124 (emphasis added). Because Faasse refused to cooperate with the probation officer by providing a Personal Financial Statement, *see* 18 U.S.C. § 3664(d)(3) ("Each defendant shall prepare and file with the probation officer an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested, the financial needs and earning ability of the defendant and the defendant's dependents, and such other information that the court requires . . . ."), we do not know whether the presentence report accurately reflects his earnings for the years 1994-98. We also cannot know whether Faasse has undisclosed assets or liabilities.

To the extent that the presentence report is incomplete, we note that "the burden is on the defendant to demonstrate that a restitution order far exceeds his resources and earning potential." *Adams*, 214 F.3d at 730; *see also* 18 U.S.C. § 3664(e) ("The burden of demonstrating the financial resources of the defendant . . . shall be on the defendant."). We believe that Faasse's unwillingness to provide the probation officer with complete financial and employment information has effectively constrained our decision-making with regard to the amount of restitution. We are, therefore, compelled to conclude that he has not met his burden of persuasion to prove that the restitution order exceeds his earning potential or his financial resources. We note, moreover, that even if Faasse does lack the present ability to pay, this court has previously held that a defendant's indigency is not a bar to an order of restitution because ability to pay is "but one factor for the court to consider. . . ." *United States v. Bondurant*, 39 F.3d 665, 668 (6th Cir. 1994) (noting relevance of other factors including defendant's intelligence, academic background, and likely ability to obtain a job).

records that Faasse earned $14,510 in 1994 but had no reported income in 1995. J.A. at 116, 123. The probation officer noted that she "encountered difficulty establishing the defendant's source(s) of subsistence in 1996." J.A. at 116. Social Security Administration records reflected that Faasse earned $2,200 in 1996, although he maintained an apartment with a monthly rent of $945.00, apparently with financial assistance from his family. From July 1996 to August 1997, Faasse earned approximately $1,000 every two weeks. *Id.* According to Social Security Administration records, Faasse earned approximately $40,000 in 1997. J.A. at 123. From August 1997 to February 1998, Faasse worked for a different employer and earned commissions of unknown sums. Thereafter, Faasse was basically unemployed from February to September 1998, when he was convicted of the present offense, and his income for that period is also unknown. *Id.*

Based on Faasse's earnings detailed in the presentence report, it first appears that the magistrate judge had no "indication that [the] defendant w[ould] be able to pay the amount of restitution ordered," *Dunigan*, 163 F.3d at 982, particularly in one lump sum payable immediately, as was ordered by the district court. J.A. at 19. As is clear from the above recitation of Faasse's employment record, however, the presentence report is substantially incomplete. Faasse's probation officer reported that Faasse's "views and beliefs regarding the federal criminal justice system [] made him uncooperative in the gathering of facts and material relevant to the preparation of the presentence report." J.A. at 117. The probation officer also found that Faasse "was evasive regarding his personal background, employment, and criminal histories." *Id.* In the section on the defendant's employment record, the presentence report states that the probation officer "encountered difficulty identifying and verifying the defendant's employment history. The defendant presented false and misleading information to this officer on many occasions." J.A. at 122. The probation officer concluded:

> [I]t is difficult to gauge the defendant's ability to pay. If his most recent employment works out, he should have

order requiring him to pay $28,438.35 in restitution.[15] We review the district court's decision to order a specific amount of restitution for an abuse of discretion. *United States v. Adams*, 214 F.3d 724, 730 (6th Cir. 2000) (noting also that the legal issue of whether restitution is permitted under law is reviewed de novo).

The CSRA requires a court, upon a conviction under the Act, to order restitution under 18 U.S.C. § 3663 "in an amount equal to the past due support obligation as it exists at the time of sentencing." 18 U.S.C. § 228(c) (1994). Section 3663(a)(1)(B)(i) requires courts to consider, when determining the amount of restitution to be ordered, "(I) the amount of the loss sustained by each victim as a result of the offense; and (II) the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3663(a)(1)(B)(i).

Faasse's sole argument is that the magistrate judge abused his discretion by failing to consider "the financial needs and earning ability of the defendant" when fashioning the restitution order. Specifically, Faasse argues that the magistrate judge did not adequately consider the effect of Faasse's six-month term of imprisonment and the consequent loss of his job on his earning ability. According to Faasse, "[f]ailure to reduce the restitution award in light of Mr. Faasse's circumstances constitutes an abuse of discretion that warrants remand for reconsideration of an appropriate restitution award." Appellant's Br. at 13.

In support of his position, Faasse cites to this court's decision in *United States v. Dunigan*, 163 F.3d 979, 982 (6th Cir. 1999), in which a panel of this court reversed the district court's imposition of a $311,605 restitution order on a defendant sentenced to thirty-one months in prison. The *Dunigan* court determined that the district court had failed to

---

[15] We note that the parties do not dispute that this is the total amount due and owing in unpaid court-ordered child support.

consider, pursuant to the statute, Dunigan's ability to pay, in light of the defendant's extremely meager financial assets and the lack of any evidence in the record that the defendant could pay what amounted to $8,000 after-tax dollars per month every month for three years during his supervised release.

We have held that the district court must consider each of the statutory factors in § 3663 when determining the specific amount ordered as restitution. *United States v. Sanders*, 95 F.3d 449, 456 (6th Cir. 1996). The district court is not, however, required to make explicit findings about each statutory factor, *id.*, although we held in *Dunigan* that "a district court must have, at a minimum, some indication that a defendant will be able to pay the amount of restitution ordered . . . ." *Dunigan*, 163 F.3d at 982. Thus, we noted that "[a] district court abuses its discretion when it orders restitution in an amount that it finds the defendant is not likely to be able to pay." *Id.* (quoting *United States v. Fuentes*, 107 F.3d 1515, 1529 (11th Cir. 1997)).

In Faasse's case, we believe that the district court adequately considered the appropriate statutory factors, including the defendant's financial status. The magistrate judge stated at the sentencing hearing:

> I don't see any resolution of this case other than the one I'm going to impose, and that is the statutory maximum here is six months and I'm going to impose the six-month sentence. If I thought that — and obviously I know that this means the defendant's going to lose his job. If I thought that letting him keep his job would mean that he would start supporting his child, it's the last thing in the world I'd do is take his job away from him, but I don't believe for a moment that getting this particular job at $22,000 a year plus commissions is going to do anything for this child.

> The defendant has a long track record here of not supporting the child so what I'm going to do is incarcerate the defendant, make a lesson of him for himself and for others, and at the end of six months then

> he can decide whether he wants to continue in his obstructionist fashion.

> ***

> I think the defendant has had means and methods to pay this money all along, he just will not, and in a case where the Court decides that it's the defendant's will and not his inability that's the problem I think this is what the Court ought to do.

J.A. at 107-08. The transcript makes clear that the magistrate judge did not ignore "the financial needs and earning ability of the defendant" when ordering restitution. The magistrate judge explicitly contemplated that Faasse would lose his job when sentencing him but believed that, employed or not, Faasse was not likely willingly to support his daughter. The magistrate judge attributed Faasse's failure to make child support payments to his lack of "will" to pay, not to his financial inability. Thus, unlike the situation in *Dunigan*, in which the district court "expressed considerable doubt that Dunigan ever would be able to pay," *Dunigan*, 163 F.3d at 982, the magistrate judge in this case believed that Faasse could pay the child support should he so choose.

Having determined that the magistrate judge did not ignore the appropriate statutory factors, we must consider whether there is sufficient evidence in the record to support the amount of restitution ordered, or whether the restitution order constituted an abuse of the magistrate judge's discretion. According to 18 U.S.C. § 3664(a), the probation officer should include in the presentence report "information sufficient for the court to exercise its discretion in fashioning a restitution order" including "information relating to the economic circumstances of each defendant." The presentence report in this case reflects that Faasse has never earned a consistent livelihood. According to the probation officer's report, Faasse was in an automobile accident in February 1994. Faasse asserted that this accident prohibited him from working from 1994 to the middle of 1996. J.A. at 123. The probation officer learned from Social Security Administration